HYDROSPACE–CHALLENGER, INC., Plaintiff-Appellee,

v.

TRACOR/MAS, INC., Defendant-Appellant-Cross Appellee,

v.

The WILLIAM J. BURNS INTERNATIONAL DETECTIVE AGENCY, Defendant-Appellee-Cross Appellant.

No. 74–2182.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1975.

Wicker, Smith, Pyszka, Blomzvist, Davant, McMath, Tutan & O'Hara, Ft. Lauderdale, Fla., Jose R. Garcia-Pedrosa, Richard A. Sherman, Miami, Fla., for Tracor/Mas.

Reginald M. Hayden, Jr., Miami, Fla., for Hydro. Challenger.

James D. Acosta, Victor H. Womack, Miami, Fla., for Burns Det. Agency.

Before BROWN, Chief Judge, and GODBOLD and CLARK, Circuit Judges.

CLARK, Circuit Judge:

This is an admiralty case. It comes to us after trial to the court without a jury. At the conclusion of the trial the court read into the record its informal findings of fact and conclusions of law, from which the following summary is taken.

I

A. SUMMARY OF FACTS

On September 28, 1971, plaintiff Hydrospace Challenger, Inc., (HCI), brought its research vessel, the DANIEL HARRIS, III, into the shipyard operated by defendant Tracor/MAS, Inc., for repairs and refitting. A few days thereafter, it was hauled on the syncrolift dry dock and its crew sent ashore. On Saturday, October 1, 1971, at the request of Tracor/MAS and with the consent of the HARRIS' captain, the HARRIS was put back in the water after a cursory joint inspection by a shipyard employee and a crew member.[1] About one and one-half hours later, the captain and three or four crew members, who had returned for the refloating, left the HARRIS again. The vessel was locked and the key turned over to the defendant The William J. Burns Detective Agency. At this point, shore power was being supplied to the HARRIS.

On Monday morning, October 4, 1971, the HARRIS was discovered to be considerably down at the stern and listing to starboard. It was established that the cause of the list was water leakage through valves that had been opened and left unblanked or uncapped by the shipyard in the course of performing work on the HARRIS while the vessel was dry-docked. It was further established that at some time during the weekend, the shore power to the HARRIS had been cut off, preventing the operation of an electric bilge control warning system. Considerable water damage was done to the engine room and fittings of the HARRIS by the flooding.

Subsequently, HCI ordered Tracor/MAS to pump out the HARRIS and to make partial repairs. Tracor/MAS complied, at an expense of 5,734.32 dollars. Additional parts and labor were required to complete the repairs. HCI purchased the parts and performed the labor itself, at an alleged expense of 11,161.66 dollars.[2]

B. THE PLEADINGS

HCI sued Tracor/MAS and Burns jointly for the 11,161.66 dollars. It alleged that Tracor/MAS breached its contract by failing to perform the repair work for which the HARRIS was originally drydocked in accordance with good marine practice and that the shipyard's conduct breached implied warranties of workmanlike performance. The complaint charged Burns with negligence in the performance of a duty Burns owed to HCI by virtue of Burns' contract to provide guard services to Tracor/MAS' shipyard. Tracor/MAS counterclaimed for the 5,734.32 dollar preliminary repair expense it incurred for HCI's account.

---

1. The informal fact findings of the district court recite:

"[S]ort of a joint inspection was held by *an employee* of the ship and one of the crew members." (Tr. 290; App. 29).

We adopt the formulation set out here as the only reasonable interpretation of the facts that would support the description of the inspection as "joint."

2. In its answers to Burns' interrogatories, HCI itemized its claims as follows: "Miami Diesel Parts & Equipment, 3339 N.W. South River Drive, Miami, Florida, Fawick Clutch, $6328.45; HCI, Miami, labor, $880.52; HCI, Miami, labor, repair Starboard Clutch, $1,544.00; HCI, Miami, labor, to repair, disassemble and repair the port clutch, $2408.69."

HCI admitted that the work had been performed and that it had received bills and refused payment. It denied legal liability for the counterclaimed sum on the ground that Tracor/MAS' own breaches of contract had necessitated the repairs. Tracor/MAS filed a cross-claim against its codefendant, Burns, alleging that the detective agency had breached its contract with Tracor/MAS by failing to provide adequate guard services and that any and all damages the court might find were owed to HCI by Tracor/MAS were the natural and direct result of this breach. Burns denied the allegation and answered with a cross-claim of its own against Tracor/MAS. Burns' cross-claim alleged that watching the water lines of ships in the yard was not covered by any express term in the contract between Tracor/MAS and Burns. Therefore Burns claimed such work was covered by Paragraph 6 of that agreement which provided that whenever additional services not specified in the Agreement or Burns' Guard Manual were desired, the purchaser would assume responsibility for any consequences resulting from failure to perform them adequately.

## C. THE TRIAL AND ITS RESULTS

The case went to trial February 19, 1974. After hearing the evidence, the district court announced its findings of fact and conclusions of law from the bench. After finding the facts we have set out above, the district judge continued as follows. (All emphasis has been added.)

"The Court further finds that the cause for the vessel's settling was the fact that valves were open in principally the starboard stern tube flushing valve and both port and starboard sea chest valves, so that the water crossed over in the salt water line and came through the piping which the shipyard had left unblanked or uncapped.

"The Court finds that it was the responsibility of the shipyard under the terms of the contract, under Item 13 of the contract, and under the further terms of good marine practices be followed, the shipyard should have plugged the piping and not left it uncapped or unblanked.

"Now, what happens at that point is a little murky and peculiar. The log of the security guards employed by Burns is just mystifying. [The reports of the night guards, one of whom was 75 years old, were unsatisfactory.] I am puzzled that the guards who were there during daylight were not called as witnesses. I will live with my lack of knowledge on that score. ·

"There was one of those guards who kept [the log] fairly complete, certainly by comparison, [to the guard] who had the 4:00 to midnight watch both Saturday and Sunday. I am unable to draw anything conclusive out of that. . . Never once does, he mention DANIEL HARRIS. It is almost as if the HARRIS wasn't there during his watch. And it is rather easy to speculate that there were no lights there that he could check. He mentioned everything else that happened: about the tide going out; barge that was caught under a dock. I won't speculate on that basis.·

"The Court does further find that there was no shore power—for whatever reason there was no shore power— aboard this vessel by Monday morning and that the electric bilge warning horn did not go off because of that. . . . .

"The Court finds that the vessel is entitled to recover from the defendant Tracor/MAS and the defendant Burns the following sum:

"Parts for the clutches in the amount of $6,328.45; cleanup labor of $880.52.

"The Court will award half of the labor expense on repairing the starboard and port clutches which amounts to total damages in favor of the plaintiff in the amount of $9,185.29.

"The Court finds that the *percentage of negligence* proportioned amongst the parties is three-fourths to the shipyard, one-fourth to the Burns Detective Agency. The Court finds that the guards, although they made some effort to noti-

fy personnel, either were not checking in the watches that were not testified about or made inadequate efforts to call when they did recognize the condition.

"The major responsibility belongs on the part of the shipyard. It is their *negligence and failure to live up to the contract* that created the possibility for a loss, and the major burden of the loss should remain upon them.

"The Court rules in favor of the plaintiff on the counterclaim of Tracor/MAS.

"That leaves what?

[COUNSEL FOR TRACOR/MAS AS TO CROSSCLAIM]: Crossclaim of Burns against Tracor/MAS based on the security service's agreement.

"THE COURT: I am going to leave Tracor/MAS and Burns where you are and—each claimant—rule against the cross-claim.

[COUNSEL FOR TRACOR/MAS]: I am sorry. Clarify that, Your Honor.

"THE COURT: Pardon?

[COUNSEL FOR TRACOR/MAS]: I don't understand who you meant to leave—

"THE COURT: I have apportioned it so that the judgment of $9,185.29 shall be against both defendants, and I think they bear responsibility in a ratio of three-fourths to one-fourth; three-fourths against Tracor and one-fourth against Burns.

"I am going to ask Mr. Hayden to prepare a judgment and incorporate those findings and those conclusions of law.

[COUNSEL FOR TRACOR/MAS]: Would you also rule on the contract count by Tracor against Burns on the crossclaim?

"THE COURT: I rule against both crossclaims.

"Is it going to pose any problems, Mr. Hayden?"

[COUNSEL FOR HCI]: No, sir.

"THE COURT: I think those findings of fact and conclusions of law will be an adequate basis for any appeal. I won't go ahead and enter any formal separate findings or conclusions.

*"If anybody feels that they are not adequate you can make a motion to enter them."*

## D. THE APPEAL

On this appeal, Tracor/MAS challenges: (i) the apportionment of damages, asserting that the proper result should have been a finding of joint and several liability on the part of both co-defendants; (ii) the denial of its counter-claim against HCI; and (iii) the denial of its cross-claim against Burns. In the alternative, Tracor/MAS alleges that Burns should be held liable for 25% of the total damages done to the HARRIS, including the 5,734.32 dollars repaired by Tracor/MAS before HCI took the ship out of the yard. Burns defends the apportionment and alternatively appeals the denial of its cross-claim against Tracor/MAS.

## II

The Federal Rules of Civil Procedure provide that in cases tried to the court without a jury, the court "shall find the facts specially and state separately its conclusions of law thereon . . . ." Rule 52(a), Fed.R.Civ.P. Of course, the law and the facts can never be entirely separated, and all the policies underlying Rule 52 may be advanced without time-consuming and frequently unnecessary attempts at perfect dissection and labeling of the elements of a case. *See, e. g., Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 516 (5th Cir. 1969). But, as the Supreme Court has said,

The well-recognized difficulty of distinguishing between law and fact clearly does not absolve district courts of their duty in hard and complex cases to make a studied effort toward definiteness. Statements conclusory in nature are to be eschewed in favor of statements of the preliminary and basic facts on which the District Court relied. . . . Otherwise, their findings are useless for appellate purposes.

*Dalehite v. United States,* 346 U.S. 15, 24 n. 8, 73 S.Ct. 956, 962, 97 L.Ed. 1427, 1434 (1953).

■ We have concluded that the findings of the district court do not provide a sufficiently definite predicate for proper appellate review. Many of the findings are couched in conclusory terms. Some were announced solely as ultimate findings without support which clearly reflected a choice between conflicting accounts of events or between alternate legal interpretations of those events. This court cannot be left to guess. The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied. *See Daniel v. Washington County Board of Education,* 488 F.2d 82 (5th Cir. 1973); *United States v. Northside Realty Associates, Inc.,* 474 F.2d 1164 (5th Cir. 1973); *Lettsome v. United States,* 434 F.2d 907 (5th Cir. 1970) (second remand).

For several reasons, we order remand in this case with more than the usual reluctance. First, the controversy is relatively limited, with the principal protagonists being the codefendants. Second, the parties themselves, despite the explicit invitation of the trial court to request more definite findings, declined to do so. Third, the district court displayed an understandable desire to bypass the welter of claims, counterclaims and cross-claims—couched in tort, contract, or both—and reach a just determination of "the heart of the matter" on the basis of the equities rather than formal distinctions. *See generally* Staring, *Contribution and Division of Damages in Admiralty and Maritime Cases,* 45 Calif.L.Rev. 305 (1957).

■ Unfortunately, the almost mundane damage and accounting issues which are raised by the facts here belie the legal complexity of the issues—some at the very leading edge of the law in this field of admiralty [3]—which must be decided.

The court recognized that although the action by HCI against Tracor/MAS and the cross-claims filed by Tracor/MAS and Burns against each other were brought in contract, the determination of liability depended upon delictual conduct, *i. e.,* substandard performance, whether in refloating the ship without capping or blanking its pipes or in providing guards who were too old or too poorly schooled in emergency procedures to perform their duties. Yet the court's loose conjunction of the terms "negligence" and "breach of contract" in its final statement does not reveal whether the judgment for HCI was based upon negligence alone, actions which although tortious also constituted the breach of a contractual undertaking, or a rejection of the traditional analysis for a balancing-of-fault approach. At the outset of its discussion of Burns' liability to HCI the district court clearly indicated an awareness that under HCI's complaint, the only significance of Burns-Tracor/MAS' contract was to create a duty of care running from Burns directly to HCI. However, in finally assessing Burns' liability the court's general statements about the "one-fourth negligence" of Burns do not disclose whether it accepted the HCI's tort "duty" theory as the complaint stated, treated HCI as a third-party beneficiary of the Tracor/MAS contract, or rejected a contract-related approach altogether.

The court failed to explain why it ruled against Tracor/MAS on its coun-

---

**3.** In *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), the Supreme Court declined to apply *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952) to bar contribution in a non-collision maritime case where the statutory compensation scheme of the Longshoremen & Harbor Workers' Act, 33 U.S.C. § 905, would not be impaired. The Court specifically noted that the procedural posture of the case prevented substantive treatment of the question of damage apportionment based on unequal fault or the relation of those issues to indemnity rules. 417 U.S. at 108 n.3, 109 n.4, 94 S.Ct. at 2176, 40 L.Ed.2d at 698–99.

terclaim. For aught else that appears, the court assessed three-fourths of the fault of the sinking to Tracor/MAS and one-fourth to Burns. If this be so, it is puzzling why it did not assess Burns for any portion of the water damages represented by the 5,734.32 dollars repair item. The court also failed to explain why it allowed all of HCI's claims for replacement parts and cleanup labor but only half the amount claimed for repair of the HARRIS' port and starboard clutches.

Most basically, the opinion we are asked to review does not articulate any legal or factual basis for its 75–25 apportionment of fault and damages between these co-defendants. Then too, were Tracor/MAS and Burns adjudged to be joint tortfeasors or indemnitor and indemnitee? We are not told. Yet without an explanation of this predicate, we cannot determine whether the district court intended to apply some existing theory or create a new one.

The court gave no reason for denying the cross-claims. There are numerous possible explanations: (1) the duty created by the Burns-Tracor/MAS contract was insufficiently broad to cover the conduct alleged;[4] (2) the duty created by the guard contract covered the conduct alleged but the contract would not be enforced because it would have the effect of indemnifying a party against its own negligence without a clearly specific provision for this undertaking;[5] (3) the duty, the breach and the intent to indemnify were present, but the proof failed to establish a casual link between the breach and the damage to the HARRIS;[6] (4) the duty, the breach, the intent to indemnify, and the causal link were present, but the conduct of the indemnitor, Tracor/MAS, prevented the performance of Burns' duty;[7] (5) the

doctrine of avoidable consequences precluded recovery, wholly or in part.[8]

Finally, the confusion multiplies when one notes that there was conflicting testimony as to *whether* the guards were suppose to check the waterlines of the ships in the yard and, if so, *who* assigned them. The district court did not clearly resolve these issues of fact. In the absence of such a resolution, Paragraph 6 of the guard service agreement cannot be construed. This is critical here because most of the interpretational possibilities listed above apply equally to the obligations Tracor/MAS claimed Burns assumed under the guard service agreement and the obligations Burns claimed Tracor/MAS assumed under the provisions of Paragraph 6.

Concededly, many of the determinations yet to be made are purely or primarily legal in character and could be made by this court in the course of its review if the crucial but unfound facts were implicit in the district court's resolution of the case, *see, e. g., Glassman Construction Co. v. United States ex rel. Clark-Fontana Paint Co.,* 421 F.2d 212 (4th Cir. 1970), or if the legal conclusions were simply the unstated obverse of a previous legal determination, *see, e. g., Lockett v. Henderson,* 484 F.2d 62 (5th Cir. 1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974). Those possibilities are not present in the case before us. Where, as here, multiple legal interpretations of undetermined or incompletely determined facts remain at the appellate stage, our review function cannot be performed. Our only recourse is to remand it for the necessary refinement. We do so without intimating our views on any of the issues adumbrated above.

Remanded with directions.

---

4. Burns explicitly makes this claim with regard to the language of Paragraph 6 of the guard services agreement.

5. *See, e. g., United States v. Seckinger,* 397 U.S. 203, 211–12, 90 S.Ct. 880, 885, 25 L.Ed.2d 234, 233 (1970).

6. *See, e. g., Garner v. Cities Service Tankers Corp.,* 456 F.2d 476 (5th Cir. 1972).

7. *See, e. g., Waterman Steamship Corp. v. David,* 353 F.2d 660 (5th Cir. 1965).

8. *See, e. g., Southport Transit Co. v. Avondale Marine Ways, Inc.,* 234 F.2d 947 (5th Cir. 1956).