**Nell PENDLETON, Individually and on behalf of all others similarly situated, et al., Appellants,**

v.

**Donald RUMSFELD, Individually and as Secretary of Defense, et al.**

No. 78–2148.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1979.

Decided April 1, 1980.

David J. Cynamon, Washington, D. C., with whom Roderic V. O. Boggs, Washington, D. C., was on brief, for appellants.

Marleigh Dover Lang, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert,* U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees.

Before ROBB and WALD, Circuit Judges, and NICHOLS **, Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge NICHOLS.

Dissenting Opinion filed by Circuit Judge WALD.

NICHOLS, Judge:

This case is an appeal from a decision by U.S. District Judge John Lewis Smith, Jr. The case had been pending since 1973, largely because of waiting for decisions in other cases it was vainly hoped would dispose of this one. The name plaintiff, Mrs. Nell Pendleton, brought this action on behalf of herself, and all other black employees at Walter Reed Army Medical Center (WRAMC), alleging racial discrimination against herself and the entire class. One order, the subject of this appeal, denied certification as a class action under Fed.R. Civ.P. 23, but Ms. Helen Martin continues as a coplaintiff. The second order enters judgment for defendant and dismisses the action. The case was tried before a U.S. Magistrate who heard the witnesses and submitted findings of fact and conclusions of law on which the District Judge based his order.

Plaintiffs Pendleton and Martin were black employees of the WRAMC staff, the former being a chemist, GS–9, and the latter a dictaphone transcriber, GS–7. Pendleton was made a temporary chief EEO Counselor, GS–11, and Martin a part-time EEO Counselor. On January 30, 1973, General Moncrief, Commandant of WRAMC, terminated both plaintiffs as EEO Counselors, demoting Pendleton back to her GS–9 chemist position. No change in Martin's

grade or pay was effected. That is the action complained of, and General Moncrief took it because of their having participated, as he supposed, in what he regarded as a disruptive demonstration in the offices of Colonel Mary Preston. Other name plaintiffs have been eliminated for various reasons and their participation in the case is not a question we have to pass on.

The suit is founded on Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of March 24, 1972, 42 U.S.C. § 2000e *et seq.*, and more particularly § 704(a), 42 U.S.C. § 2000e-3(a), which provides in pertinent part as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

■ The judge refused to certify the class because of absence of typicality, the unnamed plaintiffs not having ever been named as EEO Counselors or summarily removed from that position in alleged reprisal for participating in the alleged demonstration. As will be seen, our determination of the claims of Pendleton and Martin will turn on what they were employed to do as EEO Counselors, what they did in the alleged demonstration, and whether their removal was in reprisal, for opposing any practice made an improper employment practice by the applicable law. These issues are peculiar to the claims of Pendleton and Martin. They wanted and still want to make the case into a general inquest into racial discrimination at WRAMC, but this is not an issue in this case. Defendant concedes that such problems existed, if in less pejorative terms, still sufficient for plaintiffs' purposes, if relevant. It says:

---

* United States Attorney at the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 293(a).

When Walter H. Moncrief assumed command of the Walter Reed Army Medical Center in May 1972 * * *, the Center suffered from problems of poor personnel management and racial unrest. * * * Although during his tenure, Walter Reed made significant strides in these areas, not all of the problems were solved right away. * * * [Appellee's brief, p. 3, record citations and footnote omitted.]

This really says it all, if in bland terms, and amply concedes that the conditions plaintiffs were protesting against actually existed. Thus the issues the District Court and this panel must evaluate are entirely distinct and have nothing in common with the general inquest plaintiffs would like to take place. The District Judge correctly conceded that the claims or defenses of the class members "need not mirror each other" but he quotes Federal Practice and Procedure § 1764 that "Rule 23(a)(3) may be used to screen out class actions when the legal or factual position of the representatives is markedly different from that of other members, even though common issues of law or fact are raised." A fortiori, we add, when *no common issue* of law or fact is raised. *Bostick v. Boorstin,* 617 F.2d 871 (D.C. Cir. 1980). The fundamental error of the appeal is in trying to make an issue out of the alleged or real iniquities of the *ancien regime* at WRAMC, which no one denies now, and everyone concedes.

Since the court properly refused to certify this case as a class action, the remaining issue is on the merits and is whether removal of the plaintiffs from their positions as EEO Counselors was a breach of the Civil Rights Act provision above-quoted. The plaintiffs were protesting conditions which well may have been subject to protest, but the issues remaining are whether the personnel actions General Moncrief took, removing plaintiffs from their duty assignments as EEO Counselors, and in plaintiff Pendleton's case, reducing her from her temporary GS–11 grade to her permanent GS–9, were reprisals, that "discriminate[d]" against the plaintiffs because they "opposed any practice made unlawful by this sub-

chapter," *i. e.,* by the Civil Rights Act. No one else's alleged discrimination is in issue.

■ If there was or had been a discriminatory mentality at WRAMC, there is little to show that General Moncrief, a recent appointee, shared it. His mission there was to correct it, and the findings confirm his good intentions. It should be noted that as against allegations of reprisal, General Moncrief is entitled to the usual presumption of good faith of official action, rebuttable of course. *Cook v. United States,* 210 Ct.Cl. 368, 536 F.2d 365 (1976). Unless the contrary is shown, we are required to presume that he opposed violations of the Civil Rights Act, as of all other law, and welcomed exposures of wrongdoing that he could correct; also that he had employed plaintiffs as EEO Counselors to perform effective services along such lines.

Plaintiffs had their day in court on their personal claims, the District Judge having referred the defendant's motion to dismiss to U.S. Magistrate Henry H. Kennedy for proposed findings and recommendations for disposition, designating him as a "special master." This was after the court had refused class certification. Magistrate Kennedy conducted an evidentiary hearing, after which he submitted proposed findings of fact and conclusions of law. The authority under which the judge acted, 28 U.S.C. § 636, requires that proposed findings of fact and conclusions of law be served on the parties. This was done and the record reflects that plaintiffs filed no written objections as § 636 and Fed.R.Civ.P. 53 authorized them to do. The District Judge could have concluded that the proposed findings of fact and rulings of law were unobjectionable. *Campbell v. United States District Court for N. Dist. of Cal.,* 9 Cir., 501 F.2d 196, 206, *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974). At any rate, by his order he recited that no objection had been filed, that he adopted the proposed findings of fact and rulings of law as his own, that judgment was entered for defendants and the action dismissed. Plaintiffs had filed out of time a notice of ap-

peal, from the magistrate's findings of fact and conclusions of law, which apparently was docketed as objections and disregarded for its untimeliness, but in any event failed to enlighten as to the specifics of what was wrong with the magistrate's work product, except that it upheld the contentions of the wrong party.

■ Fed.R.Civ.P. 53 required the District Judge to affirm unless the findings and conclusions were "clearly erroneous." We think, having failed to call his attention to any errors, the parties are too late in attempting to do so here, and in any event, fail to address the specific findings now with exceptions to show how they erred. Instead, each side has favored us with its version of the facts based on selected portions of the transcript, in disregard of the findings. There was much conflict in the testimony, and where any such testimony is contrary to a finding of fact, we may infer that the magistrate disbelieved it.

Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. * * [Jackson, *Justice* in *United States v. Yellow Cab Co.*, 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)].

Fed.R.Civ.P. 52 refers to the opportunity of the trier of fact to judge the credibility of witnesses, and findings of fact are not to be set aside unless clearly erroneous. *Bostick v. Boorstin,* 617 F.2d 871 (D.C. Cir. 1980). We think we may properly make our own findings, in view of what has occurred, only where they are based on uncontradicted evidence and are in no way inconsistent with the magistrate's findings.

The plaintiffs' brief, though exhaustive, does not face up to this obligation and show how and where the findings are "clearly erroneous," supposing that despite their neglect below, plaintiffs retained the right to do this, nor do their attacks as made defer properly to the findings of one in a position to judge the credibility of witnesses. For this reason, we disregard fact assertions that overleap or ignore the findings and call on us to work directly from the transcript.

We do consider, however, the uncontested documentary evidence, especially *EEO Counseling, Civilian Personnel Pamphlet* No. 74, a well written brochure, dated January 17, 1973, which was or should have been the plaintiffs' bible.

■ It must further be said that plaintiffs make no claim to legal tenure rights or a property interest in their jobs, by the analysis that has obtained in the Federal courts since *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Their sole claim is that management has discriminated contrary to the statute, and if discrimination is not found, inquiry is at an end. Specifically, the inquiry properly was held not to be whether General Moncrief would have been "better advised to have retained plaintiffs in their positions." If, as alleged, his reaction was "ill informed and rash" this was found not relevant to a violation of the Act.

Plaintiff Pendleton was first employed as an EEO Counselor in April 1972, and did such good work she received a citation. In August she was promoted to Chief EEO Counselor, a full-time job. Martin became a part-time EEO Counselor in October. General Moncrief had been Commandant since May 1972, and as a result of previous investigations, was specially charged with improving Walter Reed's "personnel practices and racial problems."

On January 29, 1973, an incident took place in the offices of Colonel Mary Preston in the Food Services Division. General Moncrief discharged plaintiffs from their EEO positions January 30 and 31, for reasons not stated in the dismissal letters. General Moncrief later informed Martin the removal was because of participation in the above-mentioned incident. Plaintiffs asserted this incident was a press conference, but Magistrate Kennedy resolved conflicting testimony to find that the incident was "if not quite an unlawful, disruptive demonstration, much more than a press conference." About noon "Jan. 23" [sic., evidently Jan. 29 is meant], a large group crowded into Colonel Preston's office, including media and persons who would normally have

been working. They spilled over into the hallway adjacent to the cafeteria. The meeting was not a question and answer session between press and spokespersons, but a reading of numerous grievances of food service workers. There was no violence, but "the crowd was abnormally vocal." Neither Colonel Preston nor the General had given permission for use of her office in this fashion. Thus it was a demonstration rather than a press conference.

Plaintiffs claimed they were mere bystanders, attending as observers in their EEO capacities. Defendant said they were active participants, and adduced testimony to that effect. The magistrate found they were not bystanders and observers, but were active participants, and were discharged because of it. The reason given for the discharges was not their opposition to the unlawful employment practices then rife, as we assume, but their manner of opposition.

The magistrate concluded that the case law interpreting the statute left the stated activity open to "case by case" interpretation, and on balance he concluded that the activity was not "protected." He conceded plaintiffs' right to express grievances and even, at times, to demonstrate in areas not always of the employers' choosing. But the circumstances here swing the balance for defendant. These included that the involved facility was both military and medical, on both grounds requiring less deviance from routine and greater freedom from disruption than other business. The time and place of the demonstration were significant. General Moncrief had told plaintiff Pendleton that he could not condone a demonstration in the food division that could disrupt the feeding of patients. Ms. Pendleton so told Ms. Martin. Nevertheless, they participated.

The magistrate does not present his findings of fact and rulings of law separately, in the manner so helpful to appellate reviewers; they are commingled in a single memorandum. Thus buried in his legal discussion is the ultimate factual conclusion, which is that the reason for General Mon-

crief's action, as summarized above "the court does not find to be a pretext." This really says it all. It involves looking into General Moncrief's mind—though possibly with the benefit of information he should have had but did not, owing to the haste in which he acted—and holding that the alleged reason was the true reason. If plaintiffs were fired for the improper manner of their opposition to racial malpractice at WRAMC, not the opposition itself, then the statute does not by its terms apply.

The magistrate never refers to a matter which, in our view, is quite correctly stressed by the parties, the actual duties of the plaintiffs as EEO Counselors. Their attorney seems to see no real difference between such duties and those of *e. g.*, an officer of an organization of black employees, formed to resist discrimination, or of a union of such employees. Defendant relies heavily on the statement that a Counselor must be a "bridge" between grievants and management. EEO Counseling, *supra*, 5–1, 6–1, CPR § 713.2e. Other passages are even more telling. Section 6–3 exhorts Counselors to understand the differences in people, and, 6–4, the background of behavior. This would include the behavior of generals. Section 6–11 is entitled *Working with Managers*, and deals with the necessity of getting the side of the story believed by managers and supervisors, to convince them that "you [the Counselor] are neutral * *," to show them how "you" can help them, and relieve them of their fear "you" are undermining them both with top management and with their employees. Section 7–3 is captioned *Understanding Management's Problems* and discusses at length the need to understand management problems, *e. g.*, budget and manpower ceilings, that might have an impact on claims of racial or sex discrimination. After talking over the grievance with the grievant and the supervisor, the Counselor must "make a judgment concerning the matter and attempt to facilitate an acceptable resolution." CPR § 713.2e(5)(b).

Plaintiffs and the dissent point to provisions stating that EEO Counselors should

possess a "knowledge and awareness of minority groups' background, traits, customs and/or language," CPR § 713.2e(5)(a), and should be persons "on whom employees rely to add credibility to the system." Manual at 5–2. Such requirements may have led to a search for militant types of EEO Counselors, or at least a tolerance of militancy, but this made all the more needful some adjustment in the behavior of a Counselor, once selected, to reflect the responsibilities of at least a quasi-member of the management team. The Supreme Court has recently stated, in another context, that an employer is entitled to the "undivided loyalty" of its representatives. *National Labor Relations Board v. Yeshiwa University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). Plaintiffs' roles perhaps were conceived as dual, they represented by General Moncrief and the employee grievants, to counsel and negotiate informal settlement of grievances without going over the heads of middle management. General Moncrief, as the spokesman for the employer, the United States, was entitled to the amount of loyalty specified in the Manual, at least.

■■ In determining the limits of protected activity, *"The requirements of the job* and the tolerable limits of conduct in a particular setting must be explored." *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976) (emphasis supplied). It seems fairly obvious that a reasonable person in General Moncrief's position might, on learning of the plaintiffs' parts in the demonstration, have felt that they had fatally compromised their ability to gain the confidence of middle management, as spelled out in the Handbook, and that they were lacking in ability to appreciate management's point of view or see the facts as management saw them. It would not matter whether the General and the plaintiffs were actually familiar with the contents of the Handbook, because these are the requirements of the job, as any person of common sense would perceive. Without the confidence of middle management, a Counselor would be useless to top management, because he or she, having no authority to order anything done,

could not forestall formal grievance cases and get grievances settled early and at low levels of authority. The attorney for plaintiffs overlooks that the right kind of Counselor, the kind the Handbook advocates, would not be just a gadfly to management, like a union representative, but would be a help to management. The private settlement of grievances is a purpose of the Act. *Hochstadt v. Worcester Foundation, supra,* at 233.

If plaintiffs could not get grievances settled without involving top management, their merely reporting to top management the grievant's version of the case would be useless. It would not serve to forestall, as here, unwelcome demonstrations that served further to polarize the parties. Top management would have to intervene, to get diverted from the many other problems incident to running a great medical center, and deprive middle management of the credit of being able to manage their own employee relations. Plaintiffs' version of the EEO Counselor's "bridge" function as being simply to convey employee grievances to management, as a recognized union official might do, or as plaintiff Pendleton had been doing before being appointed EEO Counselor, simply will not survive a fair and careful reading of the Handbook, and grossly underrates the significance of the job.

■ In our view, differing from what we suppose was the magistrate's, by his silence on the subject, the problem before us for resolution really has the duties of an EEO Counselor as its most significant element. The decision to remove any employee must be made primarily in light of that employee's duties. A question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear. Whether the participation of any employee not an EEO Counselor in the demonstration would be "protected activity" is an issue not before us for resolution, and, as to which we express no opinion. No case has been cited to us wherein what is "protected activity" in the instance of an EEO Counselor is decided. We do not

see any useful purpose served in turning over decisions dealing with "protected activity" in other contexts.

The dissent, like the plaintiffs' brief, cites a good deal of testimony inconsistent with the magistrate's findings, testimony which he apparently disbelieved. We think the plaintiffs, by failing to attack the findings in the time and manner provided by law, before the District Judge adopted them, as well as their failure to recognize the impact of the "clearly erroneous" test and to be specific as to when the magistrate went wrong, preclude such use of the testimony here. Moreover, the dissent fails as plaintiffs do to appreciate the full scope and meaning of the EEO Counselor's job.

Accordingly, the order and judgment appealed from are

*Affirmed.*

WALD, Circuit Judge, dissenting:

Appellants Pendleton and Martin were two black women Equal Employment Opportunity (EEO) counselors at Walter Reed Army Medical Center (WRAMC) who were relieved of their EEO counselor jobs for "active participation" in an employee protest on January 29, 1973 against racial discrimination in the Food Services Division. The district court referred the matter for trial to a United States magistrate appointed to act as special master. The magistrate issued findings and conclusions justifying appellants' termination as EEO counselors on the ground that "active participation" in this employee protest was not protected activity under § 704(a), the anti-retaliatory provision of Title VII. 42 U.S.C. 2000e–3(a) (1976). The district judge adopted the magistrate's findings and conclusions and a majority of this panel affirms that action by the district court.[1]

Before concluding that appellants' behavior was inappropriate to their role as EEO counselors and hence that their separation from their EEO positions was not violative of § 704(a), I would remand for particularized findings:

(1) on the state of race relations between management and employees at WRAMC in January, 1973;

(2) on the functions and responsibilities of appellants' positions as EEO counselors; and

(3) on the precise nature and extent of appellants' "active participation" in the employee protest which precipitated their dismissals as EEO counselors (a subject on which there is much conflicting evidence in the record).[2]

1. In an earlier order, also appealed here, the district court ruled that the claims of EEO counselors Pendleton and Martin were not "typical" of those of the class they sought to represent and hence the class could not be certified under Fed.R.Civ.P. 23. Because of the majority's disposition on the Pendleton and Martin claims on the merits, I do not discuss the class action issue here.

2. In my view the magistrate's failure both to make such particularized findings and to incorporate these findings in the balancing required under § 704(a), *Hochstadt v. Worcester Foundation,* 545 F.2d 222, 231 (1st Cir. 1976), *infra,* note 13, constitutes error. *Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 433 (5th Cir. 1977) (district court's finding of antitrust liability remanded for more specific factual findings) (" 'The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied.' "), *quoting Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.,* 520 F.2d 1030, 1034 (5th Cir. 1975). *Cf. Ring v. Schlesinger,* 502 F.2d

479, 490 (D.C. Cir. 1974) (district court's failure to balance first amendment freedoms of dismissed public employee against asserted governmental interest constitutes error).

I find no error in the factual findings that were made, but in the failure to make the additional or more particularized factual findings necessary to analysis under § 704(a). Such error is not governed by the "clearly erroneous" rules of Fed.R.Civ.P. 52(a) and Fed. R.Civ.P. 53(e)(2). *See Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d at 432–34 (Rule 52(a) requirement that facts be found "specially" distinguished from "clearly erroneous" standard of review applicable to facts found); *Servo Corp. v. Gen. Elec. Co.,* 393 F.2d 551, 556 (4th Cir. 1968) (remand in view of absence of sufficiently particularized findings in master's report on which to predicate district court's judgment).

Error may be noticed and corrected by the district court regardless of the fact of, or timeliness of, objections to a master's findings. 5A, J. Moore Federal Practice ¶ 53.11, 2991 (2d Ed. 1979). In any event the appellees do not argue

### 1. Race Relations at WRAMC

The magistrate's opinion adopted by the district court referred to the "widely acknowledged racial troubles at the institution" as well as to the "weaknesses of the EEO program" prior to this time. It also mentioned "substantial evidence adduced at the hearing . . . that the civilian job structure at Walter Reed had long placed blacks in lower level positions and that the Center's administration had traditionally evinced hostility toward efforts to improve personnel and race relations problems." However, in his findings, which were adopted by the district court, the magistrate made it clear that he thought the background of race discrimination at Walter Reed irrelevant. He stated:

> At the outset, it is important to note what this case is not about. First, even though substantial evidence adduced at the hearing suggest that the civilian job structure at Walter Reed had long placed blacks in lower level positions and that the Center's administration had traditionally evinced hostility towards efforts to improve personnel and race relations problems, the issue in this action is not whether blacks generally were subject to racial discrimination at Walter Reed. Plaintiffs' motion for class certification, which presumably would have put in issue whether there was "across the board" discrimination at Walter Reed, was denied.

Joint Appendix (J.A.) 78.

The record shows that for some time prior to this protest the racial situation at Walter Reed was, in the words of the EEO officer for the Office of the Surgeon General, "very, very tense." Trial Transcript (Tr.) 30. There had been prior protests (Tr. 96–98, 239–40, 372, 507) and a "lockout" of outside speakers at a planned rally. Tr. 64, 105, 504–08. Over 80% of the 1500 black employees belonged to an organization called UBAD (United Blacks Against Discrimination). (Pendleton was co-chairman

the lack of objection or untimeliness of objections to the findings and conclusions of the special master appointed here. Nor do they

(Tr. 166) and Martin secretary (Tr. 211) of UBAD at the time of these events.) The District of Columbia Congressional Representative, Hon. William Fauntroy, after having been "locked out" from the rally already mentioned, became engaged in discussions between employees and the WRAMC management. Tr. 580–88. A Civil Service Commission team which conducted an investigation in January 1973 characterized "race relations" at WRAMC as a "major problem" and continued:

> Minorities distrust management and allege past and present discriminatory practices.

> .      .      .      .      .

> Progress in correcting past problems is slow and hampers management efforts to achieve credibility with dissatisfied work force, which remains generally angry, bitter and frustrated over what they feel are systems which do not respond to their needs.

Tr. 565.

The nature of an EEO counselor's role, as outlined in the relevant regulations and counseling manual and discussed below, necessarily derives from, and depends upon, the context of "minority group" relations where the counselor works. In determining the scope of protection against retaliation to be afforded these EEO counselors under § 704(a), the racial context should not have been ignored.[3]

### 2. Appellants' Roles as EEO Counselors

The magistrate made no particularized findings or conclusions on the functions and responsibilities of these EEO counselors. The only finding which expressly addressed the nature of appellants' roles as counselors was that, "[a]s an EEO counselor, Pendleton counseled other employees and brought their grievances to management's attention." J.A. 77.

contend that the appeal taken to this court was untimely.

**3.** *See* discussion *infra*, note 13.

The EEO program at WRAMC had been revitalized shortly before the incidents here at issue in an attempt to deal with persistent racial tensions and appellant Pendleton had been appointed a fulltime chief EEO counselor.[4] It is apparent that perceptions as to what role an EEO counselor should play in this situation varied widely. The Civil Service Commission report already mentioned recognized the problems which these differing perceptions posed and recommended that "[t]op level management [at WRAMC] . . . clearly define responsibilities and duties of EEO staff, establish its expectations in each program and set logical objectives and time frames for accomplishments in affirmative action programs." Tr. 459.

The Army regulations establishing the EEO counseling program (CPR § 713.2e(5)) referred to the counselor as a "bridge between employees and management[, who is] . . . responsible for attempting to resolve problems which are brought to his attention by employees." The regulations cautioned that the counselor should "avoid assumption of an advocacy role in behalf of either management or an employee," (*id.*), but also emphasized that:

> Since the equal employment opportunity counselor's ability to communicate effectively is of the utmost importance, employees will be selected for such assignments with due regard for their knowledge and awareness of minority groups' backgrounds, traits, customs and/or language, and the likelihood of their acceptability to such groups.

*Id.* The Army's EEO counseling manual, issued January 17, 1973, told counselors they "function independently of the formal system"; that they were "neutral" parties to whom employees could "openly relate." Dept. of the Army, EEO Counseling, CPP, 74, 5–1 (Jan. 17, 1973). The manual continued:

> As a counselor, . . . you should have your finger on the pulse of the work environment; you should know the feelings of women and minority group employees, the work situation, supervisor-employee relations, and you should be the person on whom employees rely to add credibility to the system.
>
> . . . . .
>
> Your chief goal then is to hear the problem and to get the parties talking on the issues. Your major effort is to work with the broken lines of communications, to repair them whenever you can, and at least to bridge them when repairs are not possible. You are most of all a communications bridge.

*Id.* at 5–1, 6–1.

Neither the regulations nor the manual said anything about attendance at or participation in group protests, but counselors besides Pendleton and Martin made it a practice to go to such protests in order to "have empathy" (Tr. 270), to "know exactly how employees and management feel" *Id.*, because "in order to be . . . an active participant in the resolution of the problems, you first had to understand and know what was going on." Tr. 297–98.[5]

---

4. Prior to January, 1973, Pendleton had been very active in employee grievance activities, including earlier protests inside the hospital complex and meetings between Rep. Fauntroy and hospital officials. She had been selected in the summer of 1972 over 24 other candidates for the chief counselor position despite or even because of her high visibility in bringing employee grievances to management's attention. As an EEO counselor, she had been officially cited for "outstanding ability to cooperate with others . . . .. [She] exercises tact and diplomacy in all her dealings and is respected and admired by her coworkers." J.A. 77.

5. Pendleton herself testified that a major aspect of EEO counseling was to look at the background out of which the complaint came and to try to see if there were any kinds of systematic violations of policy, of regulations, or any suggestions or recommendations that could be made that would insure that this particular problem would not arise again. Tr. 88.

She said she attended the demonstration in question "for the purpose of observing and also to see what complaints would be raised with regard to employees who were working there." Tr. 120.

William Moncrief, commanding general of WRAMC at the time of these incidents, and the individual who ordered appellants' dismissal as EEO counselors, testified that appellants'

> performance in [the] demonstration [at issue] underlined to me their inability to perform satisfactorily as EEO counselors; that this demonstration and their leadership in this demonstration was inimical to my interpretation of what an EEO counselor should be, and the EEO counselors reflected, as far as I was concerned, the image of the command and this just was not the image that I wanted Walter Reed to have.

Tr. 523.

When Moncrief first learned that this "demonstration" was about to occur, he told Pendleton to "see that it was called off." Tr. 445, 465, 467, 520, 543.[6] When she instead attended and "participated" in it, she

was terminated, along with Martin. Although the magistrate found that several other counselors attended this protest (J.A. 80; Tr. 270, 297–98), it appears that only Pendleton and Martin were terminated for so doing. Tr. 203.

However the counselors may have perceived their EEO roles, it seems clear that WRAMC management thought of the counselors as "an extension of management" and that they "serve[d] at the pleasure of management." Tr. 556 (testimony of WRAMC civilian personnel officer).[7]

### 3. Appellants' Participation in the Protest

The magistrate found the "precise extent of [appellants'] . . . participation in the food services' demonstration [ ] unclear" (J.A. 80), but that they were "active participants," not "mere bystanders and observ-

---

Martin testified that her concept of an EEO counselor was "[t]o bring to the attention of management the problems in the areas that the complainants had." Tr. 196. She continued: [O]ne of the first things that I was told by the EEO office . . . was that anything that concerned the people, the employees at Walter Reed, any meeting that concerned them or any gathering, they knew of, the EEO counselor should attend. And I attended everything I could.
Tr. 199–200.

6. Moncrief stated, as part of the EEO investigation resulting from Martin's dismissal:
I said, Ms. Pendleton, I want you to get back to whoever "they" are, and tell them that I will not tolerate a demonstration or a confrontation that disrupts activities of this installation.
I said you get back to them and tell them that they can have the theatre, out here on the grass, or in any parking lot that they want, but they will not demonstrate in any office and disrupt the mission of this hospital.

I told her once again that you better get back to your colleagues. I am not going to have this, and I am not going to tolerate your participation, because you are an EEO counselor. I am not going to tolerate your participation in this demonstration in any office on this facility.
Opposition of Defendants to Motion for Certification as a Class Action. Ex. II, Enc. 1, Ex. 0 at 7–8.
Colonel Davis, who was present at the Moncrief-Pendleton meeting, testified that Pendle-

ton's response was that "she would talk with the other counsellors, but she did not know what influence she might have over them. . . ." Tr. 445. Pendleton testified that she responded by expressly asking General Moncrief whether he was directing her not to attend the protest and that Moncrief answered in the negative. Tr. 119. She further testified that she offered to make any statement Moncrief wanted her to at the demonstration. Tr. 119. An EEO officer at the WRAMC, also present at the meeting, thought Moncrief had told Pendleton to get in touch with leaders of the demonstration to call it off, and that Pendleton said she could not. Tr. 465. He also thought Moncrief then "told [Pendleton] to contact all counsellors and at least be sure they did not attend, or for them to do what they could to not have it. . . ." Tr. 467. At trial General Moncrief was asked whether he told Pendleton specifically that EEO counselors could not attend the protest. He replied, "I told her to tell anybody that she knew who was going to be in the demonstration that I would not tolerate it." Tr. 543.

7. This was at least in part because management considered appellants' positions as EEO counselors "temporary." *Id.* Speaking of Pendleton, Moncrief testified at Martin's EEO hearing:
I told her that this being a temporary appointment she should understand that she was in this job as long as she behaved, and as long as she acted as I felt an EEO Counselor should.
Ex. 0 *supra*, note 4 at 5.

ers." J.A. 81. These were the only findings made by the magistrate on the nature and extent of Pendleton's and Martin's participation in the January 29, 1973 protest.

The magistrate stated that the protest in question consisted of a group of employees,[8] accompanied by media representatives, converging at noontime on an office of the head of the Food Services Division and spilling over into the hallway adjoining the cafeteria.[9] J.A. 80. During the protest a list of grievances was read and the group voiced encouragement to the protestors. No violence or threat of violence occurred.[10] J.A. 79–80. Nor apparently, was obscene or abusive language used. Tr. 245.

The protest's "unprotected" nature, according to the magistrate, stemmed from the fact that it occurred in a military medical facility requiring "less deviance from routine and greater freedom from disruption" (J.A. 84);[11] the time and place—noon near the cafeteria (*id.*);[12] its "abnormally vocal" quality (J.A. 80); and the fact that it was done against the specific wishes of the commander. *Id.*

Nothing in the record requires the conclusion that Pendleton's and Martin's attendance at this protest was inconsistent with their EEO counselor roles, given the context of racial tension at WRAMC. Indeed they and other counselors had been present at prior demonstrations, and it would not be an unreasonable reading of their manual to infer that as "bridges" they had special dispensation to attend such meetings in order to fulfill their job of attempting informal resolution of disputes and keeping management informed of employee grievances. This might well be true whether or not the protest—as to other employees—stayed within the uncertain boundaries of "protected activity" under Title VII.[13]

---

8. Estimates varied considerably on how large the group was, from 40–50 (Tr. 271) (testimony of an EEO counselor) to around 70. Ex. O, *supra*, note 4 at 8 (Moncrief statement).

9. Both staff and ambulatory patients are apparently fed in the cafeteria. Tr. 274.

10. H. A. Nohsey, a military officer who was present, testified in answer to the following question:

Q And so, as I understand it, the essence of this meeting was that a large group of people came into Colonel Preston's office, one man read a list of demands and got encouragement from the group, other employees may have made some statements regarding the grievances and then the group dispersed. Is that correct?

A That's more or less it.

Tr. 360.

11. There is no evidence in the record to show what, if any, disruption to the cafeteria's operations or to patient feeding actually occurred. Tr. 217, 299, 479–81.

12. General Moncrief had told Pendleton the protestors could conduct their protest elsewhere than in the vicinity of the cafeteria. The record is not clear whether that offer was made to anyone apart from Pendleton.

13. The magistrate here found that the object of the demonstration—"what they perceived as unlawful employment practices"—was presumably legitimate, but the "manner" of the opposition was not. J.A. 81–82. He said appellants had rights as employees and even as EEO counselors, a right and a duty to express their grievances and it is unrealistic and a far too narrow a reading of the statute to exclude all demonstrations from the Act's protection or to limit protests to areas of the employer's choosing.

J.A. 83.

Recognizing that the precise limits of employee self-help "protected" activity were unclear, the court nevertheless apparently found this protest outside those limits, *citing, inter alia, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hochstadt v. Worcester Foundation*, 545 F.2d 222 (1st Cir. 1976); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). J.A. 82–83. As the court in *Hochstadt* noted:

Neither in its wording nor legislative history does section 704(a) make plain how far Congress meant to immunize hostile and disruptive employee activity when it declared it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." . . . The statute says no more, and the committee reports on the Civil Rights Act of 1964 and the Equal Employment Opportunity Act of 1963, which later became Title VII of the Civil Rights Act, repeat the language of 704(a) without any explanation. . . . The proceedings and floor debates over Title VII are similarly unrevealing. Courts are thus left to develop their own interpretation of protected opposition.

545 F.2d at 230 (Citations omitted). Here, as in *Hochstadt*,

Thus it becomes critical to decide what appellants did at the protest that could be considered inconsistent with their EEO roles, given the background of race relations in which they functioned. A finding of inconsistency with their EEO roles might well depend upon exactly what happened at the meeting and whether appellants' contribution aggravated or mitigated disruption, helped to build or to burn "bridges."

The deficiency of the magistrate's findings on this score has already been noted. My review of the record indicates substantial conflicting evidence in this respect—conflict which should have been and should now be resolved by the trier of fact. Some witnesses testified the two women did nothing more than, or different from, any other participants at the meeting. Tr. 282, 284. Pendleton was accused by a few military observers of making remarks during the meeting dramatically illustrating her sympathy with the protestors.[14] The only such evidence as to Martin, however, was that she said "Right on, Sister" (Tr. 320) and, in response to the Food Service Division chief's reference to employees as "boys" remonstrated: "These are not boys; these are men." Tr. 200, 320.[15] Neither woman appears to have participated in the planning of the protest or in the reading or discussion of the grievances.[16] Tr. 607 (testimony of witness present at both planning and holding of protest).

In sum, I do not think a simple finding that two EEO counselors "actively participated" in a peaceful—if noisy—protest during a turbulent period in race relations at the medical complex, without more, renders their conduct unprotected under Title VII's ban against retaliation for opposition to discriminatory practices and I would remand for more detailed findings about what they did and why it was inconsistent with their EEO counselors' roles in the context of Walter Reed's racial troubles in 1973.

---

it is [not] clear to what extent militant self-help activity . . . such as particular types of on-the-job opposition to alleged discrimination, vociferousness, expressions of hostility to an employer or superior and the like, are protected.

*Id.* at 231. The balancing test put forth in *Hochstadt,* which considers "the requirements of the job and the tolerable limits of conduct in a particular setting," *id.,* should also include the history of discrimination in that setting. *See* B. Schlei & P. Grossman, Employment Discrimination Law 433 (1976).

**14.** One officer witness claimed that Pendleton told a black chief cook to "get out from behind the desk with the while [sic] folks and come around and stand with the niggers." Tr. 320. Another said she yelled at one point, "They are killing us in here and they are getting a nigger to do it." Tr. 365, 370–1. (The same witness also described her conduct as "basically the same as anyone else's participating in the demonstration." Tr. 365.) Other attendees said she never talked at all. Tr. 282, 284.

**15.** The "men, not boys" and "right on" remarks are the only evidence of Martin's "active participation" in the record. One officer said she was "participating" because "she was, you know, near the front of the group." Tr. 346. Another answered:

> Q What did you see Helen Martin do?
> A Voicing her protest with the rest, the same as the rest of the crowd . . . ..
> THE COURT: What specifically did you see her doing, if anything?
> THE WITNESS: Cheering with the rest of the crowd.

Tr. 366.

**16.** Moncrief had apparently little information concerning the extent of Pendleton's and Martin's participation in the protest. What the record showed was that Moncrief who was not present heard from another officer, also not present, who heard from one that was present that Pendleton and Martin were there. Tr. 521, 547 (testimony of Moncrief).