John R. NOVOTNY, Plaintiff,

v.

GREAT AMERICAN FEDERAL SAV-
INGS & LOAN ASSOCIATION,
Defendant.

Betty BATIS and Shirley Flockhart,
Plaintiffs,

v.

GREAT AMERICAN FEDERAL SAV-
INGS & LOAN ASSOCIATION,
Defendant.

Civ. A. Nos. 76–1580, 76–1581.

United States District Court,
W. D. Pennsylvania.

May 17, 1982.

438

Stanley Stein, Feldstein, Grinberg, Stein & McKee, Pittsburgh, Pa., for plaintiffs.

Eugene Connors, Walter Bleil, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

### I.

### *Introduction*

These two cases were combined for trial, since they arose out of the same factual background and occurrences. Plaintiffs Betty Batis ("Batis") and Shirley Flockhart ("Flockhart") filed various employment-related sex discrimination charges against their employer, Great American Federal Savings & Loan Association (the "Association") under section 703 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2. In the other case, plaintiff John R. Novotny ("Novotny") filed charges against the Association under section 704 of Title VII, 42 U.S.C. § 2000e–3(a) [1], alleging that the Association discriminated against him because he had sided with Batis and Flockhart in their dispute with the Association.[2]

---

1. "(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a).

2. The *Novotny* case has a long judicial history. It first was assigned to the late Judge Daniel J. Snyder, Jr. of this court. Novotny's original complaint alleged that he had been injured as a result of a conspiracy to deprive him of equal protection of, and equal privileges and immunities under, the laws in violation of 42 U.S.C. § 1985(3). He also contended (as he does here) that his discharge was in retaliation for his efforts on behalf of the female employees in violation of § 704(a). Judge Snyder granted a

motion to dismiss on the ground that § 1985(3) could not be invoked because the directors of a single corporation could not, as a matter of law and fact, engage in a conspiracy. 430 F.Supp. 227 (W.D.Pa.1977). The United States Court of Appeals for the Third Circuit reversed, holding *inter alia*, that conspiracies motivated by an invidious animus against women fall within § 1985(3), that Novotny had standing to bring suit under that section, that Title VII could be the source of a right asserted in an action under § 1985(3) and that intracorporate conspiracies come within the intendment of § 1985(3). 584 F.2d 1235 (3d Cir. 1978). On *certiorari* the United States Supreme Court vacated the judgment of the Court of Appeals and remanded the case holding that § 1985(3) may not be invoked to redress violations of rights

We conducted a non-jury trial lasting eleven days and heard the testimony of twenty-three witnesses. We will enter judgment for the defendant and against all of the plaintiffs. In accordance with Rule 52 of the Federal Rules of Civil Procedure, we now make findings of fact and conclusions of law.

## II.

### Findings of Fact

#### 1. Background

At the time of the events leading to these charges, Novotny was secretary of the Association and also a member of its board of directors; Batis was assistant treasurer and had just been transferred (she asserts "demoted") from the position of head teller to that of savings counselor; Flockhart was a clerk/typist/secretary.

The transfer of Batis from head teller to savings counselor, which she shall subsequently describe in detail, was the event which we believe led to the filing of the various charges by the plaintiffs in these cases, although other factors were also involved.

The Association was founded in 1914 as a club, with a fund of $250, put up by several people of Slovak background. They used to meet weekly in the Slovak Literary Club in Homestead, a suburb of Pittsburgh, and operated as a self-help group, soliciting other Slovaks to give money in pledges to lend to other Slovaks. During those early years it was called the "1st Slovak Building & Loan Association."

The members elected someone each year to supervise the affairs of the Association, but it had no paid employees and did not really become a business until March, 1937, when it received a federal charter and was renamed "1st Federal Savings & Loan Association of Homestead." In 1975 it became "Great American Federal Savings & Loan Association."

Until about 1976 it remained basically a small, neighborhood savings and loan associ-

ation with its home office in Homestead. It also had started branch offices in neighboring McKeesport (in 1955), Braddock and Clairton (both established in 1957). The Braddock office later was moved to Forest Hills. Steelworkers, their families and local businessmen kept their savings and obtained their mortgages there; it continued to cater particularly to customers of Eastern European extraction. In the mid '70's a decision was made to attempt to shed the local image, and increase the number of offices; hence the change of name in 1975. In 1976 the Association opened another branch in New Stanton, and in 1978 one in Elizabeth, both nearby towns.

Management was rather informal. There was a board of directors which elected someone each year to manage the affairs of the Association. The board consisted of the fifteen men who originated the 1st Slovak Building & Loan Association. Mary V. Lane was the first full-time employee of the Association. She started work around 1937 and stayed on until her retirement on December 31, 1977. Stephen Straka, secretary of the Association, represented management at the time of Mrs. Lane's hiring. Despite his volunteer status, Straka came to the Homestead office every day. Daniel T. Kubasak, its present president, was the second full-time employee, hired in December, 1940. Mrs. Lane taught him about the business, and the two of them operated it under Straka's supervision until Kubasak entered the Army in 1943. Upon his release in July, 1946, he returned to the Association. By then there were ten or twelve employees. Kubasak's tenure was again interrupted when he was recalled into the Army during the Korean conflict. He served in the Army this time from November, 1950 to July, 1952.

Beginning in 1946, the board started holding an annual election at which they chose a president, secretary and treasurer; not until 1976 did the board create the office of vice president. There was little job-related movement by the officers; they served until they retired or died.

created by Title VII.  442 U.S. 366, 99 S.Ct.  235, 60 L.Ed.2d 957 (1979).

A chart of those who held the top offices looks like this:

1946–1952

President: Michael Schram (died 1952)
Secretary: Frank Mosley (died 1952)
Treasurer: James E. Orris

1952–1960

President: Wendel Platak (died 1960)
Secretary
& Treasurer: James E. Orris

1960–1973

President: James E. Orris (retired 1973)
Secretary: Daniel T. Kubasak
Treasurer: John Novotny (plaintiff)

1973–1975

President: Daniel T. Kubasak
Secretary: John Novotny (not reelected 1975)
Treasurer: John Micenko

1975–1976

President: Daniel T. Kubasak
Secretary: John Micenko
Treasurer: Andrew Getsy

As the Association grew, the officers became salaried and full time. The day-to-day affairs of the Association were administered by the president, secretary and treasurer, who worked together informally and by consensus. The directors met every two weeks.

It was following Kubasak's return from the Army in 1946 that the board started electing the three officers as noted above. In addition, the board named Mary Lane assistant treasurer and Kubasak assistant secretary. Later, for reasons unknown, the titles were reversed; Lane became assistant secretary and Kubasak assistant treasurer. By 1960 Kubasak had had experience in virtually all phases of the business of the Association and in that year, as shown in the chart, he moved into the chain of command as secretary, and Lane began performing the duties of a head teller, although the title "head teller" did not exist, as such, until November, 1973.

2. Novotny Biographical Facts

Novotny is a white male, first employed by the Association as a clerk on May 1, 1950. In December, 1950 he was recalled into the armed service because of the Korean conflict. Upon his discharge, he returned to the Association in July, 1952 as a clerk. The Association had about twelve employees at that time, and its only office was the one in Homestead. The then president, Michael Schram, suggested that Novotny learn how to take mortgage applications, which he did. In 1955 he became a loan officer, and in 1960 he was elected treasurer of the Association at the same time as Kubasak's election as secretary. As previously described, the president, secretary and treasurer operated as an informal managing triumvirate in the operations of the Association.

President James E. Orris retired in 1973, and the board elected Kubasak president, Novotny secretary and John Micenko treasurer. This made Novotny the second highest ranking officer of the Association. In January, 1974, at the suggestion of Kubasak, Novotny was elected to the board of directors of the Association.

There is no evidence that prior to July, 1974, any officer or member of the board of directors ever questioned the competence, integrity or loyalty of Novotny.

The board of directors is self-perpetuating for all intents and purposes. People who have deposits with the Association have a vote, similar to a corporate stockholder, but nearly all depositors give proxies for their votes to a committee of the board. Prior to 1975 the practice had been that the only Association employees to serve on the board were the president and secretary. There is an annual meeting of the Association in January at which directors are elected by the depositors or their proxy holders; this is followed by an organization meeting of the board at which officers are elected.

The incident for which Batis was allegedly demoted from head teller to savings counselor occurred on Friday, July 19, 1974. Further related events took place the following Monday, July 22, 1974 and at regular bi-weekly board of directors' meetings held July 30, August 13 and August 27, 1974.

At the annual meeting of the depositors on January 22, 1975, a resolution was passed stating that of the operating corporate officers, only the president of the Asso-

ciation could serve on the board of directors (thus making Novotny no longer eligible for board membership). At the board of directors' meeting which immediately followed the Association meeting Novotny was not reelected secretary; rather, John Micenko, who had been treasurer, was elected secretary, and Andrew Getsy was elected treasurer.

Novotny was then asked to resign as an employee, which he refused to do. Thereupon, a letter dated January 22, 1975, signed by John A. Virostek, chairman of the board was handed to Novotny. It advised him that he was no longer secretary of the Association and that his services as an employee were terminated.

On January 29, 1975, Novotny initiated a charge against the Association with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of section 704(a) of Title VII of the Civil Rights Act of 1964, as amended. He complied with all subsequent jurisdictional prerequisites.

### 3. Batis Biographical Facts

Batis is a white female. She was hired by the Association as a clerk on April 9, 1956. She is a high school graduate. After six months the Association's then secretary-treasurer, James Orris, asked her if she wanted to be a bookkeeper. She acted as a bookkeeper for a year after being trained by an employee who was leaving to have a baby. Around the end of 1957 she became a mail clerk, handling mortgage payments, savings deposits and other items that came to the Association by mail.

Soon thereafter she also became a part-time teller filling in for other tellers at lunch hour and on busy days. She later became a full-time teller, calculating interest on mortgages and loans, ultimately trained new tellers and generally had duties of responsibility. She continued as a teller until 1973. In August, 1973, she was appointed head teller and assistant treasurer of the Association. She supervised the day-to-day work of seven tellers.

On Friday, July 19, 1974 Batis was advised that on the following Monday, July 22, 1974 she would no longer be head teller but would be a savings counselor, assisting Mary Lane. Batis was replaced in the head teller's position by a male. There was no reduction in Batis' salary or benefits as a result of this transfer.

In November, 1975 the Association awarded titles to six male employees and on December 3, 1975, announced it in the local newspaper. Five assistant vice presidents and one assistant secretary were named. They received no increase in salary or benefits as a result of receiving the titles. The title changes were made to cause the structure of titles within the Association to conform to those in other financial institutions and to help with the new image the Association was trying to project.

On January 12, 1976, within the limits prescribed by Title VII of the Civil Rights Act of 1964, as amended, Batis initiated with the EEOC a sex discrimination charge, alleging that the award of the titles constituted part of an ongoing pattern of discrimination against female employees, which pattern included her alleged demotion from her position of head teller in July, 1974 and the promotion of an allegedly less qualified male to that position. She also charged she was paid less than the male she had replaced, less than the male who replaced her and that she was denied certain educational opportunities.

On February 3, 1976, Batis initiated a second charge alleging a pattern and practice by the Association of sex discrimination against females with regard to wages, promotions and job assignments.

On May 19, 1976, Batis initiated a third charge against the Association alleging that the Association had retaliated against her for having filed the previous charges by denying her two promotions which were given in March, 1976, to two females who were less qualified than Batis for the jobs. On each of these three charges, Batis complied with the requisite administrative procedures.

Batis is still employed by the Association.

### 4. Flockhart Biographical Facts

Flockhart is a white female, hired by the Association as a receptionist in 1957. She acted as a receptionist for seven years but had other duties as well, such as helping tellers by adding withdrawals and deposits on an adding machine and processing checks for attorneys for real estate closings.

In 1964 she became a secretary. She was the only secretary in the Homestead office, had the usual secretarial duties regarding correspondence and also filled out government forms, relieved at the telephone switchboard, made journal entries and handled a number of other tasks.

In 1979 she transferred to the McKeesport branch office and has continued to work as a secretary there.

A number of Association employees, both males and females, were hired after Flockhart but were promoted to other jobs.

On January 12, 1976 Flockhart initiated a charge with the EEOC alleging, among other things, that the designation of titles for the six male employees in November, 1975, constituted part of a consistent practice by the Association of denying females equal salaries and promotional opportunities and equal access to supervisory or management positions.

On May 19, 1976, Flockhart filed a second charge, alleging that as a result of her initial charge she was denied a promotion to a position which was instead given to a less qualified female employee. Flockhart satisfied all jurisdictional prerequisites with respect to both charges.

Prior to January, 1976, Flockhart never received any criticism from her supervisors concerning her work performance.

Flockhart is still employed by the Association.

### 5. The "Incident"

On Friday, July 19, 1974, President Kubasak, Secretary Novotny and Treasurer Micenko unanimously decided to relieve Batis of her duties as head teller and make her a so-called "savings counselor," assisting Mary Lane. She had, up until then, been spending part of her time as a savings counselor and the rest of it as head teller.

Batis had been made head teller and assistant treasurer in August, 1973, on the recommendation of Novotny. She was also given the official designation "head teller," a title which had never before been part of the Association's table of organization.

By sometime in July, 1974, problems among the tellers became apparent. Several of the tellers complained that one of their number, Laurel Kolcun, was bossing the other tellers around and was Batis' "pet." On one occasion Treasurer Micenko directed teller Cynthia Himes to help Dorothy Danko, the tax clerk, because Danko was behind in her work. Himes soon stopped helping Danko because the other tellers had "browbeaten" her into stopping, despite Micenko's directions. When asked why she hadn't taken action, Batis asserted that she hadn't known about this. On July 19, Janet Kovach, a teller, told Batis that she would not "buy" bonds at the end of the day. This was a method used by tellers in balancing their accounts at the end of the day. One teller would "buy" the bonds of the other tellers and then be responsible for accounting for all of them.

Rather than handling this problem involving workers under her direct supervision herself, Batis sought direction from Kubasak, who told her simply to tell Kovach that she had to buy the bonds. Micenko investigated, reported back to Kubasak and Novotny, and then all three of the management team concluded that the tellers were not being properly supervised and decided to transfer Batis to full-time savings counselor. After discussion, they decided to replace her with Lawrence A. Michael, who happened to be a male. Novotny concurred in the decision. According to Kubasak, the reason Michael was given the job was because he was the best qualified person, a "take charge" type who had good rapport with the tellers. He had been assisting the tellers from time to time, balancing accounts at the end of the day, counting change and answering their questions about mortgages and the operations of letter ma-

chines and computers. Kubasak specifically denied that the fact that Michael was a male had anything to do with the situation, and we believed his testimony. Novotny and Batis testified that Michael was not well-qualified, but none of the other tellers had more than eighteen months' experience except Laurel Kolcun, and she had been part of the problem that led to the transfer of Batis.

Michael, a graduate of Penn State, had been hired by the Association in 1972 on the recommendation of Novotny. According to Michael's testimony he had done everything at the Association from unloading trucks and salting ice on the sidewalk to assisting tellers in balancing accounts, clerking and serving customers. He was well-liked by the other employees.

The management team also felt the transfer of Batis would be beneficial to the Association because she could deal with more customers. Her salary remained the same; it was not reduced. She was fluent in Slovak and Hungarian, which was spoken by many of the Association's customers, and could help implement the rapidly developing savings certificate sales.

The team decided to inform Batis and Michael of the changes at the close of business on Friday, July 19. Novotny testified that while he went along with the transfer at first, he changed his mind later in the day and told this to Kubasak and also told him that Batis was qualified for the job of head teller, while Michael was not. Kubasak denied that Novotny told him that day (July 19) that he had changed his mind. Kubasak proceeded to tell Batis about the transfer at the close of business on Friday. She immediately objected, but Kubasak told her to think it over. He also told Batis that she had not been properly supervising the tellers, and according to Batis' testimony she told Kubasak that she would "check" with the tellers and ask each of them if she had caused any trouble with them.

The next day, Saturday, by sheer coincidence, Batis and Kubasak encountered each other while shopping in Gimbels Department Store. Batis was angry, and loudly accused Kubasak of sex discrimination in front of some Gimbels' customers. She also threatened to go to the chairman of the board of directors. Kubasak was embarrassed and left the area.

Over that same weekend Batis met with some of the tellers at a retirement party for another employee, and they discussed her situation.

On Monday, July 22, Novotny arrived at work around 8:30 A.M., and the tellers informed him that they would not open for work until they spoke to Kubasak. Novotny did not issue any orders to the tellers such as telling them to go back to their positions. Rather, he called Kubasak at home and told him to come down to the Association. He also told Kubasak they should change their decision about transferring Batis, that transferring her was a big mistake. He testified that he did not think it was his "place" to order the tellers back to work. Novotny said that Batis did not like the transfer and that he (Novotny) did not approve of the move either.

When Kubasak arrived he announced that Michael was to be the head teller and went to his office. The tellers followed him to his office, led by Batis, and some loud talk ensued during which Batis shouted comments such as "Kubasak's no president. He's no manager." Other tellers sided with Batis and indicated that they believed that their complaints about Batis favoring Laurel Kolcun were what had precipitated the move.

Micenko was also present and ordered the tellers to return to work. According to Kubasak, Novotny did nothing to attempt to end the work stoppage. According to Novotny, he ordered the tellers to go back to work, and they did. In any event the tellers finally went back to their windows and opened them some fifteen minutes past the normal opening time. During this period customers had been outside, looking through the windows and waiting to be let into the bank.

A regular meeting of the board of directors was scheduled for Tuesday evening,

July 30, 1974, eight days after the incident. During the preceding week tension had run high between the employees and management. Two of the tellers, Patricia Schultz and Mary Kurtz, obtained permission from board vice chairman Joseph Bugel to speak to the board. Kubasak and Micenko did not know this but had heard rumors that the tellers were going to confront the board.

During the day on July 30, Kubasak had spoken to each of the tellers, individually, in his office, seeking to find out why they wanted to speak to the board. Some of the tellers stopped and conversed with Novotny after they had been in Kubasak's office.

Novotny testified that he told Kubasak that when the girls talked to the board Kubasak would be dead. According to Kubasak, Novotny said, "Before this night is over you're going to be dead, and I'm going to be president." Novotny flatly denied saying it in the manner testified to by Kubasak. Micenko, who also heard the conversation, confirmed Kubasak's version.

Kubasak immediately asked Micenko if he had heard Novotny's "threat," to which Micenko replied that he had. Kubasak called board vice chairman Joseph Bugel and advised him of the perceived threat. Bugel, in turn, told the other directors. Novotny testified that he was using the word "dead" as a figure of speech and that no threat was intended.

**3.** *The Following Was Presented to the Members of the Board of First Federal by Betty Batis, July 30, 1974*
Gentlemen:
    It seems that all of my trouble happened Friday morning (July 19) when I went to Mr. Kubasak's office to tell him that Janet Kovach said she did not want to buy bonds at the end of the day anymore. Mr. Kubasak said she *has to buy* and that it was between Laurel and her and if Janet doesn't like it she can go to Equibank with Kathy. I also said to him that there is something bothering the tellers and Mr. Kubasak asked me to find out what it was. I said that when Jack gave Cindy taxes to do it was wrong because she is the newest teller and that she was out $100 that day. (Jack Micenko never told me that he was having Cindy work on taxes). I went and told Janet and Laurel as I was told by Mr. Kubasak at the same time that Laurel will buy bonds but when she *can't*

Insofar as these Findings of Fact are concerned, we do not believe it vital that we choose which version to believe. Suffice it to say that either version establishes that Novotny was at odds with Kubasak, and the board believed it was a threat.

The board meeting was late in starting. From closing time until the meeting started around 5:15 P.M., Novotny was physically seated in the area where the tellers worked. While everyone was waiting Novotny shouted across the lobby, "Are we or aren't we going to have a meeting?" He also shouted that if there was not going to be a meeting he was going to write a letter to the Federal Home Loan Bank. Physically and verbally Novotny gave every appearance of siding with the employees against the rest of the management team and the board of directors.

6. The Board Meetings of July 30, August 13 and August 27, 1974

At the July 30 meeting Batis and tellers Patricia Schultz and Laurel Kolcun addressed the board. Novotny stood with the employees as they spoke and at one point stated, "President Kubasak is not infallible; what are these girls to do when they have a problem?" Other tellers and plaintiff Flockhart were also present. Vice chairman Bugel told the tellers and Novotny that their complaints should be taken up with management, not the board of directors. Batis read a prepared statement to the board.[3]

Janet would *have to.* Janet said she would not do it because she was promised a raise when she went to the window and did not get it. I said that I have nothing to do with raises but that I was honored when I received extra work because the bosses had confidence in me. Nothing more was said to me about the things we discussed in the morning. Friday night as I was leaving, Mr. Kubasak said he wanted to talk to me. Micenko was there also. He said that John, Jack and him had a meeting and that since I cannot solve the problem with the girls, he would put me at the desk next to Mary Lane and I would help Mary open savings accounts and certificates. And Larry Michael would be at my desk. He said that Larry will control the girls. I asked if he is going to give money *out to the girls and he said yes.* I asked if he is going to work on the books at the end of the day and he said *yes* and I said, Mr. Kubasak I

The tellers then left, and vice chairman Bugel berated Novotny for "always" seeking special treatment for Batis. At first Novotny did not respond but then stated that it was because Batis was the best qualified. On motion of Bugel the board then voted 5–0 to terminate Batis' employment. Kubasak and Novotny abstained.

The day after the board meeting (July 31), Novotny apologized to Kubasak for what had happened the day before and asked him to intercede with the board on behalf of Batis. Kubasak agreed and contacted Bugel. Kubasak and Bugel had lunch together, and the two of them then contacted the rest of the board members and obtained their agreement to reinstate Batis temporarily, pending the next meeting of the board on August 13.

Novotny, as secretary, had been the one assigned to take the minutes of the board meetings. He was on vacation when the August 13 meeting took place. When his minutes of the July 30 meeting were read by Kubasak, it was discovered that there was no mention of the resolution terminating Batis. The board refused to approve the minutes with this omission, and Kubasak was directed to rewrite the minutes including the part about the firing of Batis. At the regularly-scheduled meeting of August 27, the minutes of the July 30 meeting, as revised by Kubasak, were approved. The board received letters of apology from Novotny and Batis, and Batis was officially reinstated. She never lost any pay as a result of the one day termination.

The board members were still upset by the actions of Novotny, not because he had defended Batis, but because he had done so in a public manner that effectively undercut the management-by-consensus system which the officers had carefully built up over many years. Kubasak discussed the situation with Eugene M. Calnan, Supervisory Agent of the Federal Home Loan Bank, requesting his advice as to whether the board could terminate Novotny immediately. Calnan's advice was that the board could but that it would be better to wait until the next annual meeting. He advised that an immediate termination might make outsiders think that Novotny had committed some dishonest act, but the following January, when Novotny's term would expire they could simply elect someone else as secretary and terminate his employment at the same time.

### 7. Novotny's Termination

At the annual meeting on January 22, 1975 John Micenko (he had been treasurer) was elected secretary in place of Novotny. When Novotny was not reelected, he asked

am very hurt because I like my job very much and I thought I was doing a good job. You might as well make me a teller and I walked out.

Saturday, I met Mr. Kubasak at Gimbels basement. I went to him and said that I had a very bad night and that I did not sleep over what he told me. He said why, you are going to open savings accounts and certificates, you are going to have it easier and will be under no pressure. I said that I do not like to sit all day, I like to be busy. I love that job. I enjoy coming to work, and that I am very happy. He said Oh Betty, just because you are happy we cannot afford to keep *you* on the job and lose all the tellers. I said Mr. Kubasak, I will check with every teller if I am causing trouble among them and I asked him to talk to them and find out their feelings if I am a trouble maker. He said to sleep on it and I will realize it will be an easy job for me. He said that Frank Vanek agreed with him that it was a good idea to take me off the job. He said that I took Mary Lane's job over and she should feel bad. I said

that Oneufer took over Mary's job. I have been here 18 years and that he is pushing fellows with less service ahead of me and not the girls and he cannot do this anymore because of equal rights. He said seniority does not count and that if seniority counted, Mary Lane should be president because she has the most service. I asked him how he got his job—seniority or what? I said that I am not satisfied with this and that I am going to go further. He said go ahead, go to Virostek. I said I am not going to Mr. Virostek, I am going higher up because you are discriminating. I told him he took Joe Uhler and John Oneufer off the window and pushed them ahead of me years ago and now he is pushing Larry ahead of me.

As I remember Mr. Bugel said at the annual meeting, "Keep your nose to the grindstone, learn all phases of the business and you will advance." I just would like to know Mr. Bugel if that statement was for everybody or only the fellows, Because every fellow holds a position or has a title. Plaintiff's Exhibit *W*

Chairman Virostek about it, and Virostek simply stated, "You are no longer secretary of the Association."

The board then voted unanimously to terminate Novotny's employment if he did not resign. Novotny refused to sign a letter of resignation which had been prepared for him, and he was then given a termination letter dated January 22, 1975, and signed by Chairman Virostek.

### 8. Recruitment of Black Employees and Female Employees

Novotny testified that one of the reasons he was suffering retaliation was because he had tried to recruit black employees for the Association. He claimed credit for recruiting a black employee, Annie Turner. His testimony implied that management was at least passively opposed to hiring black employees; in his testimony he also directly asserted that Kubasak was opposed to women being in the job market—that Kubasak felt they should stay at home and have babies. We do not believe this was borne out by the other evidence in the case.

Annie Turner, called by the defendant, testified that she did not even know Novotny until after she started working there in 1974. Testimony of others indicated that Novotny had interviewed her for a student loan in 1972, but she testified that she did not remember the person she had talked to about the loan. In any event she did not discuss employment in 1972. She testified that she had come to the Association with her mother in 1974 to seek employment and was directed to Andrew Getsy by a receptionist. She obtained the job after the interview with Getsy.

She also testified that after she started working at the Association Novotny did not take any particular interest in her or ask how she was getting along.

James E. Orris, who was president of the Association from 1960 to 1973 testified that he personally had talked to various black civic leaders in an attempt to recruit black employees. He stated that such recruitment was difficult because of the higher salaries paid by heavy industry in the area.

### 9. Batis Allegations

Batis asserts that she was demoted from the position of head teller as a result of sex discrimination, that men with less seniority and the same duties were paid higher wages than she, that she was denied educational opportunities by the Association and that less competent females than she were promoted as a retaliation against her for filing earlier discrimination charges.

On July 19, 1974, when it was decided to transfer Batis from head teller to full time savings counselor she already was spending part of her time as such a counselor. At that time the only full time savings counselor was Mary Lane. Lane had previously been head teller and had been moved to the savings counselor position. At Kubasak's suggestion, Lane had been given the title of "assistant vice president." It will be recalled that Mary Lane was the very first full-time employee of the Association. Other females had moved from head teller to savings counselor positions and then on to other management jobs in the Association. Mary Lane later became assistant branch manager in the Homestead office. Kathleen Hruska became "Savings Operations Coordinator" (a supervisor-management type position) after having been a savings counselor.

There is no defined line of progression from head teller to any higher ranking position in the Association.

When Batis was transferred to savings counselor she received no cut in salary or diminished benefits. Batis had alleged that she was paid lower wages for doing the same work as men. She mentioned John Oneufer, whom she had succeeded as head teller, and Lawrence Michael, who, as noted, had replaced her. The duties of head teller were always combined with other duties; in fact the first person ever to be "officially" designated head teller was Batis, and she still had spent part of her time as a savings counselor. Other head tellers performed other tasks while acting as head teller. For example both Oneufer and Michael made daily deposits of the Association funds at Pittsburgh National Bank and an-

alyzed and "broke down" loans, neither of which Batis did. Oneufer spent about 25% of his time on loans. Batis did not perform these duties as head teller.

It is impossible to find a criterion of "equal pay for substantially equal work" in this type of situation. The duties performed were not substantially the same, neither did plaintiffs attempt to break down the various functions and duties of the various head tellers, and, indeed, we do not believe it would have been possible to do so with any degree of accuracy.

10. Educational Opportunities for Batis

Batis also averred that she was not given the same educational and professional opportunities as males.

Batis attended courses offered by a professional school called the "Savings & Loan Institute," now the "Institute of Financial Education." Her tuition was paid by the Association, and she received what were called a "Standard Diploma" and a "Graduate Diploma." The Association also sought to enroll her in a management leadership program offered by the Institute of Financial Education, but she was not accepted.

She was invited to attend the Western Pennsylvania-Eastern Ohio dinners put on by the Savings & Loan Institute from 1977 through 1981. She attended in 1977 and 1978 but chose not to attend in 1979, 1980 and 1981.

She did not name any male employee who had greater educational opportunities than she had.

11. Promotional Opportunities for Batis

For thirteen years, from 1960 to 1973, there was not one change in personnel serving as president, secretary or treasurer. Only one assistant branch manager's position existed during this period. This was in McKeesport, and in 1972 one male (Richard Orris) replaced another male (Louis Farkas). There were no other changes in this position from 1972 until 1977.

In August, 1973 Mary Lane, who had held the title of assistant treasurer, was designated assistant vice president, and Batis became assistant treasurer and head teller.

In November, 1975, all branch managers of the Association, the collections manager and the loan officer of the Association were given the titles of assistant vice-president, and Lawrence Michael was given the title of assistant secretary. It was the announcement of those designations in the newspaper which prompted Batis to file the EEOC charges, although her allegations included charges that a pattern of sex discrimination had existed over the years at the Association and that her transfer from head teller to savings counselor was a representative example of the pattern.

The pay, work assignments and responsibilities of all the persons given titles in November, 1975 remained exactly the same.

In March, 1976, Josephine Hickey was made assistant branch manager in Forest Hills, and at the same time Nancy Tacsik was made assistant branch manager in Clairton. This caused Batis to file her third charge, asserting that the Association did not offer her either of those jobs in retaliation for her filing the earlier discrimination charges. Nevertheless in June and July, 1976 Batis was offered two assistant branch manager positions and rejected both of them. She was offered the position of assistant branch manager in New Stanton in June, 1976, and rejected it because she could not drive and did not want to leave Homestead. In July, 1976, she was offered the job of assistant branch manager in Clairton. She testified that she turned that job down because she didn't want to travel to Clairton.

12. Flockhart's Allegations

Flockhart's initial discrimination charge was prompted by the same newspaper article which caused Batis to file hers—the December 3, 1975 article which announced the designation of titles for the six male employees. In May, 1976, she filed a second charge alleging retaliation partially on the same grounds that Batis had—that the promotion of Josephine Hickey as branch manager in Forest Hills was in retaliation against her and that she should have had that job. She also filed a retaliation charge

on the grounds that her desk had been moved to a less desirable location in the Association after she had filed the original charges.

Flockhart had been hired in 1957 as a receptionist. She became a clerk-typist in 1964. She became a secretary at the Association's Savings Service Center in McKeesport in 1980 as the result of bidding on that job. Flockhart has a high school diploma and took some courses at the Savings & Loan Institute but never obtained a standard or graduate diploma. She received an achievement award in 1967.

In 1972 she talked to Kubasak about job advancements and expressed interest in the position of assistant branch manager at McKeesport, a job which had already been filled by Richard Orris. She testified that when she asked Kubasak why she had not been asked, he asserted "It's a man's job." She further testified that she said to Kubasak, "You can't say that any more; that's discrimination." She did nothing more about it. Kubasak denied that he made the alleged statement about it being a "man's job."

Kubasak later offered her the job of tax clerk and secretary in the McKeesport branch, but she refused it. Some time prior to 1974 she was also asked if she would like to become a teller. She rejected this offer also.

### 13. The Alleged Retaliation

In the second half of 1976 the Association started a formal posting and bidding process for jobs, but supervisory and management jobs are still not posted nor generally open for bids.

The only change in a management position from July, 1965 to mid-1973 was the assignment of Orris as assistant branch manager in McKeesport, the job which Flockhart said she would have liked.

There was no testimony that Flockhart attempted to broaden her work experience at the Association, and she refused two proffered jobs. She did not identify any male employee who was paid at a higher salary than she and who was performing substantially equal or comparable work.

Josephine Hickey, who had been made assistant branch manager in Forest Hills, was a high school graduate and had attended night school at the University of Pittsburgh for four or five years. She had been hired by the Association as a teller in 1968 after considerable work experience at United States Steel, where she had resigned in 1948 to raise a family. She learned all phases of the Association's business just "by doing" them, knew many customers and was appointed to the assistant branch managership in Forest Hills in March, 1976. In January, 1978 she became branch manager of the Forest Hills office.

Nancy J. Tacsik, who was named assistant branch manager in Clairton in March, 1976, graduated from the Glassport High School and attended Robert Morris College for one semester when her father became ill, forcing her to seek employment. She was employed as a file clerk by the Association in March, 1965. She attended night classes at Robert Morris for another year and also took courses at the Savings & Loan Institute.

She worked as a file clerk until December, 1966 at the McKeesport branch. She told the branch manager she would like to learn to be a teller and did so and performed any other duties requested by the branch manager. She also volunteered for many tasks. In September, 1977 she transferred to Clairton and worked there as a teller, until March, 1976, when she was made assistant branch manager. Tacsik went on to become assistant branch manager at McKeesport in 1977 and ultimately was made manager of the Elizabeth office in 1980.

The facts establish that Josephine Hickey and Nancy J. Tacsik were both more qualified than Flockhart for the assistant branch managerships to which they were appointed in March, 1976.

There was little testimony about the moving of Flockhart's desk. We find that it was moved, but there is no evidence to link that with any sort of retaliation.

### 14. Expert Testimony—Statistics

Two experts in statistics testified for the plaintiffs: Bruce Levin, Ph.D., an assistant professor of public health in the division of biostatistics at Columbia University, and Sheryl F. Kelsey, Ph.D., an assistant professor at the University of Pittsburgh. John Paul Lehosczky, Ph.D., an assistant professor at Carnegie Mellon University, testified as an expert for the defendant.

Drs. Levin and Kelsey provided statistical evidence based solely on length of service, suggesting that all women had not been promoted as quickly as all men and that on average women were paid less than men.

Dr. Levin testified that for purposes of his study he had assumed that all employees—men and women—had equal qualifications. No testimony was introduced to establish this assumption as a fact.

### III.

#### *Conclusions of Law and Discussion*

Throughout the trial of the case the testimony pertaining to the respective claims of Novotny, Batis and Flockhart were presented in that order. To the extent possible, and where there is no overlap, we will attempt to deal with them in that same fashion here.

#### 1. Jurisdiction

The Association was, at all times relevant hereto, a "person" within the meaning of section 701(a) of Title VII, 42 U.S.C. § 2000e(a) and an "employer" within the meaning of section 701(b) of Title VII, 42 U.S.C. § 2000e(b).

The plaintiffs were, at all times relevant hereto, "employees" within the meaning of section 701(f) of Title VII, 42 U.S.C. § 2000e(f).

This Court has jurisdiction over the matters before it in these two combined cases. 42 U.S.C. § 2000e–5(f)(3).

#### 2. The Novotny Allegations

After alleging specifically in his complaint the facts that led to his conclusion that the Association was discriminating against women in violation of Title VII, Novotny asserted that as a result of: (i) expressing "his general support for the female employees who had made their protest,"; (ii) expressing "various opinions with regard to the obligations of [the association] in terms of employment discrimination and equal employment opportunity"; and (iii) because he "indicated his refusal to support the majority decision on the Board of Directors with regard to the termination of Batis", he was not reelected secretary or as a member of the board of directors and was terminated as an employee. (Complaint, paragraphs 22 and 23). It will be recalled that the action of the board in terminating Batis was informally rescinded by the board the day after it was taken, and formally rescinded at its meeting on August 27, 1974.

In considering a claim of retaliation by an employer against an employee the courts generally follow the order of proof and factors set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Corley v. Jackson Police Dep't*, 566 F.2d 994, 999 (5th Cir. 1978). This, we attempted to do here:

1. The plaintiff must present a prima facie case of sex discrimination (sometimes, in this case in the form of retaliation);

2. The employer then has the burden of articulating legitimate, nondiscriminatory reasons to support its action;

3. The plaintiff then has the burden of proving by a preponderance of the evidence that the employer's articulated reason was a pretext for discrimination or retaliation.

■ We recognize that in a retaliation case the plaintiff need not prove that the underlying claim of discrimination was true. *See B. Schlei & P. Grossman, Employment Discrimination Law* (Supp.1979) at 121.

■ Novotny asserts that he was terminated because of his opposition to Batis' "demotion" and short-lived termination and because of generally "standing up" for the female employees. The Association ad-

vances as reasons for its actions that: (1) Novotny's conduct was intended to advance his own ambitions and cripple the authority of President Kubasak; (ii) Novotny's asserted belief that the transfer of Batis violated Title VII was unreasonable; (iii) his chosen means of opposition were unreasonable.

Although not mentioned in his complaint, at trial we permitted Novotny to assert as another reason for retaliation against him by the Association, his alleged attempts to recruit black employees. Based on the testimony of Annie Mildred Turner, the black employee who denied that Novotny had recruited her, we believe that this assertion by Novotny was not substantiated by the evidence.

In assessing Novotny's conduct at the time of Batis' transfer from head teller to savings counselor, it is difficult to ascertain any legal grounds for his opposition. Up to the time Batis expressed her displeasure, and the tellers determined to confront the board, Novotny had done nothing to express support for Batis or any other female. By his own admission he at first agreed to the transfer of Batis. Later he said he changed his mind and concluded that the transfer was a mistake.

We have concluded that the Association had valid business reasons for transferring Batis, and that it was not motivated by any discriminatory animus toward women in general or Batis in particular.

This conclusion standing by itself, however, would not deprive Novotny of his right to recover according to some cases. In order to establish a violation of the *participation* clause the plaintiff need not prove that the underlying claim of discrimination was true. The participation clause refers to participating in an investigation, proceeding or hearing relative to discrimination under Subchapter VI (Equal Employment Opportunities).[4] The participation clause shields an employee from retaliation regardless of the merit of his EEOC charge. *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).

Two cases from the Ninth Circuit indicate differing views over whether conditions *opposed* by an employee must be found to violate Title VII. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978) indicated that the opposition by an employee must relate to a section 703 violation. In *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978), however, the court stated that although the opposition clause is narrower than the participation clause, "a narrow interpretation . . . would not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances."

The concept of what sorts of activity might, or might not be protected, was discussed in *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976). In that case the plaintiff, a female scientist employed by the defendant, had brought a number of charges against the defendant, all of which alleged sex discrimination in one form or another.

The district court had denied plaintiff's application for a preliminary injunction to prevent her discharge pending resolution of her charges by the EEOC. In affirming, the court of appeals held that in each case the courts have "to balance the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." (footnote omitted) *Id.* at 231.

We see the test to be applied to Mr. Novotny as balancing the setting in which

4. Section 2000e -3(a) provides, in part, as follows:

  It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter. (Emphasis added.)

his opposition arose and was expressed against the interests, duties and motivations of both Novotny and the Association. *See Rosser v. Laborers' Int'l Union,* 616 F.2d 221 (5th Cir. 1980), *cert. denied* 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112; *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969). In the *Rosser* case the court found that the plaintiff had, indeed, been opposing an unlawful employment practice, but that her actions had rendered her ineffective in the position for which she had been employed.

We believe that based on these cases, and our own familiarity with employer-employee relations, it is axiomatic that the higher an employee is on the management ladder, the more circumspect that employee should be in expressing opposition to employment practices of which he disapproves.

Novotny was the number two man in the Association. The board of directors and shareholders were entitled to expect loyalty, cooperation and good judgment. The Association has suggested that Novotny took Batis' side in the confrontation with Kubasak, and later with the board, in order to advance his own ambitions to become president. We believe the evidence indicates that this more cynical explanation of Novotny's conduct is, more probably than not, the correct one. Even if it were not Novotny's intention to use the Batis incident as a device to oust Kubasak from the presidency, we are certain that the Association's board believed that that was his intent. We are left with the firm conviction that the board's decision to terminate Novotny stemmed from his *modus operandi* in attempting to use the Batis incident to promote his own ends, rather than the substantive position he purported to take on the question of sex discrimination. Thus, we find that Novotny was not discharged because he·opposed what he may have thought, incorrectly, was an unlawful employment practice, but because he conducted his "opposition" in a manner, and for a reason which would be unacceptable to even the fairest of managements.

Even taken in the light most favorable to Novotny, rather than on the facts as we have found them, Novotny showed poor judgment in siding with the employees in a public confrontation, without any previous attempt to have brought about privately what he may have perceived to be better employment practices by the Association. Novotny's actions, both the morning that the tellers refused to go to work, and later at the board meeting, were disruptive, and the belief of the board that Novotny could no longer be an effective management employee was, in our opinion, warranted under all of the circumstances. It is well-settled that an employee is not protected by section 704(a) where his activity was done in a manner that resulted in his becoming a disloyal or disruptive employee. *See Rosser v. Laborers' Int'l Union,* 616 F.2d 221 (5th Cir. 1980).

Even assuming an employer has engaged in an unlawful employment practice, an employee does not have absolute protection under Title VII. In *Rosser,* the court stated:

There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by § 704(a). *See Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 230–33 & n.6 (1st Cir. 1976); *Doe v. AFL–CIO, Department of Organization, Region 6, Atlanta, Georgia,* 405 F.Supp. 389, 392–94 (N.D.Ga. 1975), *aff'd,* 537 F.2d 1141 (5th Cir. 1976). We believe that on balance, this is just such an instance.

616 F.2d at 223.

We believe this is the best that could be said of what happened in the case of Novotny. The number two man in the Association could scarcely manage and supervise successfully after a confrontation with the number one man in front of the employees he was expected to help supervise.

452

The recent case of *Pendleton v. Rumsfeld*, 628 F.2d 102 (D.C.Cir.1980) is quite similar to this one. There, two black counselors for the EEOC took part in a confrontation at Walter Reed Army Medical Center, where they worked. The plaintiff counselors were demoted to other jobs as a result. They alleged that this action was retaliatory, in violation of section 704(a). Although the counselors argued that the confrontation was merely a press conference, the court affirmed the lower court's finding that the incident was "if not quite an unlawful, disruptive demonstration, much more than a press conference." 628 F.2d at 106. The court of appeals described the scene as follows:

> About noon . . . , a large group crowded into Colonel Preston's office, including media and persons who would normally have been working. They spilled over into the hallway adjacent to the cafeteria. The meeting was not a question and answer session between press and spokespersons, but a reading of numerous grievances of food service workers. There was no violence, but "the crowd was abnormally vocal." Neither Colonel Preston nor the General had given permission for use of her office in this fashion. Thus it was a demonstration rather than a press conference.

628 F.2d at 106–07.

The court quoted the Tenth Circuit's statement in *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976) that "[t]he requirements of the job and the tolerable limits of conduct in a particular setting must be explored." The *Pendleton* court then went on to analyze the potential for damage that the actions of the plaintiffs had caused in their future dealings with management at the hospital. As EEOC counselors, it was their job to attempt to settle grievances between employees and management at the hospital. In concluding the court stated:

> . . . the problem before us for resolution really has the duties of an EEO Counselor as its most significant element. The decision to remove any employee must be made primarily in light of that employ-

ee's duties. A question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear.

In dissenting, Judge Wald felt the case should be remanded to enable the lower court to find additional facts.

The situation of the EEOC counselors in *Pendleton* was quite similar to that of Novotny. Novotny, whose duties were to be a manager or supervisor of others, suddenly sided with those others against the president of the Association.

We note that the record is devoid of evidence indicating that Novotny had opposed the employment, promotion or pay practices of the Association prior to the July 19, 1974 incident involving the transfer of Batis, and, indeed, by his own testimony he had at first agreed with that transfer.

When he did express his opposition to the Batis transfer, it was to Kubasak in front of many of the employees of the Association. Then there was a second public confrontation between him, Kubasak, Treasurer Micenko and the entire board of directors. An employer has a legitimate interest in maintaining a harmonious and congenial working environment. *See Hochstadt*, 545 F.2d at 233. *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

An analogy might be the school situation where a vice principal would side with a student against the principal in front of the other students. Nothing could be more disruptive in a school setting.

In view of the past history of the Association and Novotny's twenty-four years with it, he should not have had a public confrontation without having privately expressed his disagreement with the management team and used his best efforts to resolve the problem. If this was unsuccessful, and he still felt that the management team was violating Title VII he could then have taken whatever other legal steps he deemed necessary.

We believe that his poor judgment in this instance justified his termination, and we accept as legitimate the reasons expressed by the witnesses for the Association as to why they waited until the annual meeting to terminate his employment.

### 3. The Batis Allegations

a. The transfer and alleged denial of promotions.

■ We have already discussed in detail the transfer of Batis from head teller to savings counselor and the incidents and problems arising therefrom. As previously stated, we have concluded that the transfer was a rational business decision, unmarred by discriminatory animus on the part of the Association.

At least one other female had preceded Batis in the head teller's job, and two followed her. Mary Lane (the original Association employee) had been head teller, had been moved to the position of full time savings counselor in 1968 or 1969 and had been given the title of assistant vice president. Donna Donaldson and Monica Sage, each of whom held the position of head teller after Batis, both moved on to the full-time savings counselor position. Batis' salary and benefits remained the same. She may have perceived the move as a demotion, but we hold that it was not.

We attempted to articulate at the beginning of these Conclusions of Law (page 27) how the burden moves in a Title VII case as enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Corley v. Jackson Police Dep't*, 566 F.2d 994, 999 (5th Cir. 1978). As applied to Batis and Flockhart:

1. They had to prove that they were members of the protected class. There is no question about it; they were.

2. They had to prove that they were qualified for and applied for a job for which the Association was looking for applicants and that despite their qualifications they were rejected for invalid reasons.

The record is not good on their alleged applications for other positions; there were conflicts in testimony. We find, however, that any interest expressed in particular jobs by the women was ambiguous at best, but giving them the benefit of the doubt, we will assume that the Association knew that they were interested in certain jobs. It knew Batis was interested in remaining as head teller, and, we will assume it knew that both she and Flockhart were interested in the assistant managerships at Forest Hills, Clairton and McKeesport.

The Association asserts that Batis was not performing the job of head teller very well; we agree and believe that the replacement of her was justified for legitimate, non-discriminatory reasons.

It may have been that the transfer damaged Batis' pride; she may have been embarrassed. Perhaps she perceived it as a failure on her part (or at least that her bosses felt she had failed), but there was no reduction in her salary or other benefits.

The Association, as required, introduced evidence to justify its actions such as the fact that Batis was not properly supervising the tellers: a teller, Janet Kovach, refused to buy bonds at the end of the day, and Kubasak had to tell Batis what to do; Laurel Kolcun "bossed" other tellers around; Cynthia Himes, assigned by Micenko to help as a tax clerk, was pressured into returning to her teller's window, and Batis claimed not to know about it. Novotny never explained satisfactorily why he decided the transfer of Batis was a "mistake" after he had first agreed with Kubasak and Micenko that the transfer should be made.

During Batis' testimony we noted several things which made us, likewise, doubt her capacity to be successful as a manager or supervisor. She did not admit, of course, that she had been unable to supervise the tellers, but she testified on cross-examination that even if she had *not* been able to "control" the tellers, in her opinion, it would have been a case of sex discrimination if the Association did remove her.

Another reaction of Batis which we felt seemed inappropriate was a statement she said that she made to Kubasak when she was informed that she was being removed

as head teller. She told him that she would check with the tellers and ask each of them if she had caused any trouble with them. In her prepared statement to the board (footnote 3, page 17), she stated in part, "I said to Mr. Kubasak, I will check with every teller if I am causing trouble among them and I asked him to talk to them and find out their feelings if I am a trouble maker." We construed this statement as a suggestion that she and/or Kubasak should check with the tellers she was supposed to be supervising to see if she was supervising them properly. This is not the sort of thing one would expect a good manager or supervisor to do.

We also find that the women who were given the assistant managerships at Forest Hills and Clairton were better qualified than Batis and Flockhart.

We thus believe that the Association has articulated legitimate non-discriminatory reasons for the actions it took and that the denial of these jobs was neither a form of retaliation nor prohibited discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

b. The allegation of unequal wages.

Each of the employees who held the job of head teller had various other tasks to perform as well, and these tasks varied substantially from one person to the next. For example, both John Oneufer and Lawrence Michael, who succeeded Batis, made the daily deposits of the Association at Pittsburgh National Bank and "broke down" loans. Batis did not perform these duties. Oneufer spent approximately 25% of his time working on loans.

There had never been a job description for the position of head teller before Batis took the job.

Since no two persons who were called "head teller" performed substantially the same functions, it is not possible to conclude, in this case, that Batis received less pay than males for substantially the same work. *See·Odomes v. Nucare, Inc.*, 653 F.2d 246 (6th Cir. 1981).

c. The alleged denial of educational and professional opportunities.

At the Association's expense Batis obtained both Standard and Graduate diplomas from the Savings & Loan Institute, and through no fault of the Association, was not accepted by the Institute for the management leadership program it offered.

There was absolutely no evidence that Batis was denied any educational opportunity.

d. The alleged denial of promotional opportunities.

As noted in our Findings of Fact, the movement of employees through promotion in the early years of the Association was virtually glacial. For eight years, July, 1965 to August, 1973, there were *no* changes in personnel occupying the positions of president, secretary, treasurer or the branch managers. Only one assistant branch manager's position existed until 1976, and this was at McKeesport. Only one change occurred in that position between July, 1965 and September, 1976.

The November 1, 1975 award of titles to certain employees was later announced in the newspaper. According to Batis and Flockhart, this event precipitated their filing the original EEOC charges.

We hold that the award of these titles did not constitute a discriminatory practice by the Association. The mid-1970's were the years when the Association had begun to grow rapidly.

New branch offices had been, or soon would be, opened by the Association, and more jobs were being created. Effective November 1, 1975 all Association branch managers, the collections manager and the loan officer were given the title of assistant vice president, and Lawrence Michael was given the title of assistant secretary.

We hold that this action was taken for legitimate, non-discriminatory business reasons. The Association was attempting to shed its image as a small, local savings

institution as evidenced by the change of name in 1975 from "1st Federal Savings & Loan Association of Homestead" to "Great American Federal Savings & Loan Association," by its establishment of additional branch offices and by a more formalized chain of command. The designation of six employees by title on November 1, 1975 was consistent with those efforts and did not constitute discrimination because of sex bias against Batis or Flockhart.

The Association asserts that an employee's overall qualifications are the determining factors for promotions. Kubasak testified that in all cases the factors considered for promotion were experience (how many jobs held and how well performed) and management qualities (communication and relationships with customers and other employees, initiative and esprit de corps).

There are now five branch offices of the Association: Two of these have female branch managers (Forest Hills and Elizabeth); three have female assistant branch managers (Elizabeth, McKeesport, and New Stanton), and the assistant manager of the home office in Homestead is likewise a female.

e. The alleged retaliation.

■ Batis alleged that the March, 1976, promotions of Josephine S. Hickey to assistant branch manager at Forest Hills and Nancy Tacsik to assistant branch manager at Clairton constituted retaliation against Batis for the charges she had earlier filed with the EEOC.

The evidence introduced did not support a charge of retaliation in either the case of Josephine Hickey or Nancy Tacsik.

Hickey had started as a teller in the Forest Hills office in 1968 and had worked there consistently. There were only three employees in that office; she had learned every phase of the operations in that office, and she had established excellent rapport with the customers.

Tacsik's story is similar. She started as a teller in the McKeesport office in 1965 and transferred to Clairton as a teller in 1969.

There were just three employees in this office also, and of necessity she learned all phases of the business and had a fine relationship with the Association's customers.

There was no evidence introduced which would lead us to conclude that Batis was better qualified than either Hickey or Tacsik.

It will also be recalled that three months later, in June, 1976, Batis was offered the position of assistant branch manager in New Stanton, which she refused, and in July 1976, she was offered the same position in the Clairton office and rejected that offer as well. She refused both positions for reasons that would have rendered her unable to accept the earlier openings as well: her inability to drive and her unwillingness to leave Homestead.

4. The Flockhart allegations

a. Alleged denial of promotions and unequal wages.

■ We have attempted to follow the same pattern of analysis as we did with Batis and Novotny, following the prescribed formula of *McDonnell Douglas Corp.* As a female, Flockhart was a member of a protected class. There was little testimony at the trial that Flockhart had made any effort, or even talked to anyone about promotions. She testified that in 1972 she had talked to Kubasak about advancements and quoted Kubasak as saying that the job of assistant branch manager in McKeesport was a "man's job." She said that she told Kubasak that was discrimination. Kubasak denied this discussion ever took place. He had later offered her the jobs of both tax clerk and secretary in McKeesport, which she rejected. She testified that she declined because they were not "management." She also had been offered the job of teller prior to 1974 and had declined that offer.

She had not received either the Standard or Graduate diploma from the Savings & Loan Institute, although she took eight courses there. Flockhart testified that she had not made known her interest in some jobs because she did not know vacancies were coming up due to the fact that prior

to 1976 the Association did not post job vacancies. It is difficult to imagine that a person acting as secretary to the president and other officers of the Association since 1957 was not aware when vacancies occurred or evinced more interest in advancement if she really had such interest. In fact, in 1976, the Association established a procedure for posting and bidding on jobs which it still follows. According to the testimony of Lawrence Michael, Flockhart was responsible for typing these notices.

Flockhart named several males to whom she was senior and who had been promoted past her, but there was no evidence of any male less qualified than she who was promoted past her, nor that she had expressed interest in those particular jobs.

Neither was there evidence of any male performing the same work she did who was being paid higher wages.

b. The alleged retaliation.

Flockhart, just as Batis did, alleged that the promotions of Josephine Hickey and Nancy Tacsik to assistant branch managerships constituted retaliation against her. As we stated in discussing the Batis retaliation claim, there was no doubt that Hickey and Tacsik were better qualified that Batis, and there is no question that they were likewise better qualified than Flockhart.

Flockhart also stated that moving her desk to another part of the bank floor constituted retaliation. We think that claim is frivolous.

5. Timeliness

Relying on *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Association argues that some of the charges and much of the evidence introduced by the plaintiffs were inadmissible because of the time constraints of Title VII. Pennsylvania is a "deferral" state, and therefore the 300 day limitations period applies under Title VII. If we were to accept the Association's argument, since the EEOC charges by Batis and Flockhart were filed January 12, 1976, the earliest prior date they could use as a point of reference would have been March 18, 1975, 300 days before January 12, 1976.

Evidence of occurrences after May, 1976, was admitted with respect to the charges by Batis and Flockhart filed in May, 1976, as to alleged promotions of other women (Nancy Tacsik and Josephine Hickey) allegedly in retaliation for the earlier changes filed by Batis and Flockhart. We felt this was necessary in order to assess the entire situation as fairly as possible. Thus, in considering whether or not the March promotions of Tacsik and Hickey constituted retaliation, we believe it was fair to consider the attitudes of Batis and Flockhart, as reflected in the fact that they turned down offers of promotions in June and July, 1976. Batis' stated reasons for refusing the two offers in June and July—unwillingness to move and inability to drive—would likewise have applied to the jobs given Tacsik and Hickey in March.

We have attempted to construe the plaintiffs' claims liberally in light of the remedial purposes of Title VII. *See Hart v. J. T. Baker Chemical Corp.*, 598 F.2d 829 (3d Cir. 1979). We did not, therefore, refuse to admit any evidence from an earlier period on that basis, and we have considered all of the evidence up to the time charges were filed in arriving at these Findings of Fact and Conclusions of Law.

6. Statistics

As noted previously, plaintiffs' statistics showed that men had generally held more management positions than women throughout the history of the Association and that men were paid higher wages.

We do not believe that statistics proved plaintiffs' case. There was no proof that there was unequal pay for substantially the same work. There was no proof that the wages paid were not consistent with the tasks performed by the various employees. The history of the Association must be considered. It had only two employees (Mary Lane and Kubasak) until World War II. Thence it grew to an eleven or twelve employee business and remained fairly static until the mid-1950's when three small branch offices were added; it remained at

this plateau for twenty years until 1975 when it started to grow rapidly. For example, in 1963 the Association had 43 employees; in 1973 it had 45 employees. By 1981 this number had jumped to 118. The top management throughout was small in number and low in turnover. It is not surprising, therefore, that the statistics reflected the situation as outlined above.

The other thing that gave us pause in considering statistics was the statistician's failure to consider what we consider to be important variables. Statistics must not be accepted without careful consideration of all factors.

In *Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) the court said: "We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be refuted. In short, their usefulness depends on all of the surrounding facts and circumstances."

In this case we specifically asked one of plaintiffs experts, Dr. Levin, if, in studying promotions and salaries, he had considered such factors as the employee's personality, business-generating ability, knowledge of the community, ability to relate to customers, intelligence and experience. Dr. Levin responded that at the direction of plaintiff's counsel he had not considered any such factors at all.

The importance of these variables is demonstrated by part of the testimony of Lawrence Michael. He stated that with the advent of computers, and their use at the Association, branch managers now had more time to go out into the community to seek new business, while the assistant branch managers had more to do with the day-to-day operations of the branch offices.

Conceding that the statistics did not allow for the variables just mentioned, plaintiff's counsel argued in his brief: "Where Plaintiff's evidence, taken as a whole, considers all relevant variable factors, statistical evidence which in and of itself does not is nevertheless relevant and may in fact be more telling in the light of the non-statistical evidence." We disagree with that assessment of the situation found in this case. The plaintiff's evidence, taken as a whole, did not consider the relevant variable factors just mentioned.

We have already indicated that we believe that the Association had sound business reasons for transferring Batis, that it had not retaliated against her or Flockhart by promoting other females, that Novotny exhibited disloyalty and that Flockhart was not discriminated against.

When special qualifications are required to fill particular jobs, they should be considered, and comparisons made to "those individuals with the requisite qualifications for the particular job." *EEOC v. United Virginia Bank/Seaboard National,* 615 F.2d 147, 149 (4th Cir. 1980).

Kubasak had testified that when the management team was considering employees for promotion it gave great weight to experience with special note given to how many different jobs the employee had held, the employee's ability to communicate with customers and subordinates and *esprit de corps* embodied, in Kubasak's words, in whether the person was proud to be an employee or "just on the scene."

There is no doubt that incorporating such variables into a statistical analysis would have made Dr. Levin's job more difficult. Perhaps it would have even been impossible to allow for a factor such as personality in a statistical analysis; nevertheless in any business where there is face to face contact with customers, certainly personality must be an extremely important factor. In choosing management employees who are going to be advising customers on important financial decisions, experience and intelligence will be important, and, naturally, from the Association's perspective business-generating ability would also be an important consideration.

The Association's expert, John Paul Lehosczky, Ph.D., an assistant professor at Carnegie Mellon University, likewise felt the plaintiffs' statistical presentation was deficient. He was particularly concerned that the plaintiff's analysis had not even

considered the education of the employees, as well as the particular tasks called for in each position. He felt that the factors of in-service training, prior experience, length of prior experience and the description of what each individual did over a period of time should have been included.

We believe that the absence of these considerations in the statistical presentation of the plaintiffs rendered these statistics useless for purposes of this case. Not everyone in the world is qualified to be a bank teller or a secretary. Not every bank teller or secretary is qualified to be an assistant branch manager or branch manager.

### IV.

#### Conclusion

Novotny's claim of unlawful retaliation will be denied. The claims of Batis and Flockhart as to unlawful discrimination and retaliation will likewise be denied.